**GLOBE NEWSPAPER COMPANY, News Boston Group, Inc., New York Times Company, Dow Jones & Co., Inc., Gannett Satellite Information Network, Inc. and Tab Communications, Inc., Plaintiffs,**

v.

**BEACON HILL ARCHITECTURAL COMMISSION, Defendant.**

**Civ. A. No. 91–12297–REK.**

United States District Court, D. Massachusetts.

Feb. 28, 1994.

James C. Heigham, Choate, Hall & Stewart, Boston, MA, for plaintiffs.

John Devereaux, City of Boston Law Dept., Boston, MA, for defendant.

## OPINION

KEETON, District Judge.

### I.

This is an action for declaratory relief, damages, and preliminary and permanent in-

junction. Plaintiffs allege that a "guideline" adopted by the defendant, Beacon Hill Architectural Commission ("Commission"), is incompatible with plaintiffs' constitutional right to distribute news and information.

The complaint sought relief against a guideline ("Publication Distribution Guideline") drafted on February 21, 1991, declaring that "[p]ublication distribution boxes ... visible from a public way are not allowed within the [Historic Beacon Hill D]istrict."

On June 15, 1993, at a bench trial, this court stated oral findings and conclusions favorable to the plaintiffs and set a schedule for further proceedings to determine the precise form of the judgment to be entered.

The schedule was extended at defendant's request, without opposition by plaintiffs, even after the court had denied defendant's motion for reconsideration.

On July 15, 1993, the Commission adopted a new guideline ("Street Furniture Guideline") that facially applies to "any structure erected or placed in the public or private ways on a temporary or permanent basis."

On July 27, 1993, defendant filed a second motion for reconsideration, asking this court to rule that the Commission had the authority to adopt the Street Furniture Guideline and that the guideline is compatible with plaintiffs' First Amendment rights.

For the reasons stated in this Opinion, the court will order Final Judgment for plaintiffs, the exact terms of which are to be determined after further submissions by the parties.

## II. Factual and Procedural Background

Defendant Beacon Hill Architectural Commission ("Commission") is a governmental body created by 1955 Mass.Acts c. 616, as amended by 1958 Mass.Acts c. 314 & 315, 1963 Mass.Acts c. 622, 1965 Mass.Acts c. 429, 1975 Mass.Acts c. 741, and 1982 Mass.Acts c. 624. The purpose of the Commission is

to promote the educational, cultural, economic and general welfare of the public through the preservation of the historic Beacon Hill district, and to maintain said district as a landmark in the history of architecture and as a tangible reminder of old Boston as it existed in the early days of the commonwealth.

1955 Mass.Acts c. 616, § 2.

As explained in more detail below, the Commission is charged with reviewing the "exterior architectural features" of "structures" within the Historic Beacon Hill District ("District"). Anyone proposing to construct, install or modify such an exterior architectural feature must first obtain a certificate of appropriateness from the Commission. In the last five years, the Commission has reviewed an average of 100 such applications a year.

Based on its experience of a quarter-century in reviewing applications for certificates of appropriateness, the Commission developed policies regarding recurring types of applications. In 1981, these policies were formalized into the Historic Beacon Hill District Architectural Guidelines ("Guidelines") that specify the types of alterations considered appropriate and inappropriate to the District.

Since at least 1982, newspaper vending machines, commonly known as "newsracks," have distributed daily and weekly newspapers. Plaintiffs are newspaper entities that have placed such newsracks within the District. Each newsrack is approximately four feet high and two feet wide. Ordinarily a newsrack is affixed along the sidewalk and remains in the same location on a nearly permanent basis. But a newsrack can be moved or removed readily in response to reader demand or temporary use requirements such as sidewalk construction. One of the plaintiffs distributes a free newspaper, the Tab; the other plaintiffs use coin-operated newsracks.

In 1983 the Commission considered the regulation of newsracks but withheld action pending the outcome of a proposed city-wide regulation also under consideration at that time. No such city-wide regulation was enacted.

On October 22, 1990, the Beacon Hill Civic Association, a neighborhood organization, petitioned the Commission to adopt guidelines to exclude newsracks from the District to the extent permitted by law.

On November 15, 1990, the Commission held a public meeting regarding the petition to adopt a guideline for newsracks and directed its staff to study the proposal and report to the Commission on their recommendations. That report was completed on January 17, 1991.

On February 21, 1991, the Commission held a public hearing at which it adopted the Publication Distribution Guideline. The guideline declared:

> Publication distribution boxes (any boxes placed on the sidewalks to distribute publications, whether for charge or not) visible from a public way are not allowed within the district.

On April 1, 1991 the Commission issued a notice to the Plaintiffs of the new guideline. The Commission set a deadline of June 1, 1991 for removal of existing publication distribution boxes. It is undisputed that plaintiffs' newsracks fall within the definition of publication distribution boxes.

On June 3, 1991, plaintiff Boston Globe requested that the Commission reconsider its decision on newsracks. The Commission held a public hearing on the request on July 18, 1991. The Commission refused to modify its decision and served notice to that effect on July 26, 1991. The Commission extended the date for removal of newsracks to October 1, 1991. After plaintiffs commenced this litigation, the Commission suspended that deadline until further notice.

On August 29, 1991, plaintiffs filed this action in this court, seeking declaratory relief, damages, and preliminary and permanent injunction. Plaintiffs claim violation of their First Amendment rights and also assert that the Commission lacked authority under the law of Massachusetts to enact the challenged guideline.

At the bench trial of June 15, 1993, the court ruled that although the state has a significant interest in regulating visual clutter, the Commission had failed to show that the regulation was narrowly tailored to serve that interest without needlessly suppressing speech. Indeed, the court noted that the regulation was "narrowly tailored" in the exact opposite sense. That is, the ban extended only to those devices placed on the sidewalk that were designed to distribute expressive materials; the ban did not extend to any other objects that might also contribute to visual clutter.

On June 23, 1993, defendant moved to reopen the record to add information regarding (1) the availability of free publications at stores in and adjacent to the District, (2) fixtures that occupy the public ways of the District, (3) the area occupied by the district in proportion to the City of Boston as a whole, and (4) the nonexistence of other newsrack regulations in the city. That motion was allowed as unopposed. The defendant also moved for reconsideration of the court's ruling, or in the alternative for the court to withhold judgment. That motion was denied after a hearing on June 24, 1993.

As noted above, on July 15, 1993, the Commission adopted a new guideline ("Street Furniture Guideline"). It replaced the Publication Distribution Guideline. Its text is as follows:

> Street furniture, as defined below, shall not be permitted in the Historic Beacon Hill District with the exception of approved store-front merchandise stands and those structures erected or placed by authorized public agencies for public safety and/or public welfare purposes. Street furniture is defined as any structure erected or placed in the public or private ways on a temporary or permanent basis. Authorized public safety/public welfare street furniture includes, but is not limited to, such structures as street lights, traffic lights, mail boxes, fire hydrants, street trees, and trash receptacles.

> Any such authorized public safety/public welfare street furniture or approved store-front merchandise stands shall be subject to Commission review and shall be in keeping with the architectural and historic character of the District and the criteria for exterior architectural features as specified in Chapter 616 of the Acts of 1955 as amended.

On July 27, 1993, defendant filed a second motion for reconsideration, asking this court to rule that the Commission had the authority to issue the Street Furniture Guideline

and that the guideline is compatible with plaintiffs' federal constitutional rights under the First Amendment. Without objection, I allow the Street Furniture Guideline to be added to the trial record in this case.

### III. Scope and Exercise of Jurisdiction over State and Federal claims

This court has jurisdiction over the First Amendment claim in this action under 28 U.S.C. §§ 1331 (federal question jurisdiction) & 1343 (civil rights claims jurisdiction), and over the state law claim in this action under 28 U.S.C. § 1367 (supplemental jurisdiction).

In the decision at the close of the bench trial in this action, the court declined to reach the state law question, in part because the record before the court at that time was not adequately developed to make a proper determination of that question, and in part because the incompatibility of the Publication Distribution Guideline with plaintiffs' First Amendment rights was apparent. Since that time, the parties have filed supplemental briefs on the second motion for reconsideration. They address in more detail both the state law issue and the First Amendment issue in light of the expanded record and the Commission's adoption of the Street Furniture Guideline. The court now has a better basis for addressing the state law question as well as a different record that presents somewhat different state and federal questions.

For the reasons explained below, I determine that the Street Furniture Guideline is neither authorized by state law nor compatible with plaintiffs' First Amendment rights. Ordinarily it is inappropriate to determine a federal constitutional question when the case can be decided on state law grounds. In the present case, however, I have concluded for three reasons that I should address both the constitutional and the state law questions.

First, each question is close and reasonably disputable. My addressing both issues may facilitate appellate review and conserve judicial resources.

Second, the analysis of the constitutional question exposes factors that are relevant to consideration of the state law issue. Interpreting the state statute in the way proposed by the defendant would create grave concern about, if not certainty of, its incompatibility with the First Amendment rights of the plaintiffs for the reasons explained in this Opinion. The interpretation of the state statute adopted here better serves the values embodied in the First Amendment. Also, analysis of the scope of the Commission's authority under the state statute is aided by considering, among other factors, whether the state's and municipality's interest in regulation of clutter and preservation of the historical character of the Beacon Hill area are sufficient to justify the burden that the Street Furniture Guideline places on plaintiffs' speech.

Third, close analysis of the state-law issues exposes factors that aid determination of the First Amendment issue. Whether a law is compatible with the First Amendment sometimes depends, at least in part, on the state's justification for the law. The state law analysis here shows that the state law delegation of authority to the Commission is much narrower than defendant suggests. In turn, the state interest that the Commission is empowered to invoke has less weight than defendant contends in comparison with the interests protected by the First Amendment. This is a factor in the court's determination that the Street Furniture Guideline is incompatible with the First Amendment interests of the plaintiffs.

### IV. The State Law Claim

#### A. Are Newsracks Structures?

The Commission's enabling statute gives it jurisdiction to review "exterior architectural features," which are defined as

the architectural style and general arrangement of such portion of the exterior of a structure as is designed to be open to view from a public way, including kind, color and texture of the building material of such portion and type of all windows, doors, lights, signs, and other fixtures appurtenant to such portion.

1955 Mass.Acts c. 616 § 3. According to this definition, something cannot be an "exterior architectural feature" subject to commission review unless it is a portion of the exterior of a "structure." The statute says that a

" '[s]tructure' [is] a structure as defined in the Boston Building Code." In fact, a separate Boston Building Code no longer exists. But the parties have agreed that the uniform state building code is the relevant successor provision that governs. It provides that a "structure" is

> [a] combination of materials assembled at a fixed location to give support or shelter, such as a building, framework, retaining wall, tent, reviewing stand, platform, bin, fence, sign, flagpole, recreational tramway, mast or radio antenna or the like. The word "structure" shall be construed, where the context requires as though followed by the words "or part of parts thereof."

Mass.G.L. c. 143 § 1.

Plaintiffs urge that this definition of "structure" should not be construed to cover newsracks. This contention presents a close and rather curious question.

Plaintiffs argue that since newsracks may be, and sometimes are, moved from place to place, they are not "assembled at a fixed location." They also argue that newsracks do not provide "support or shelter."

Defendant counters by pointing out that plaintiffs have stipulated that "newsracks commonly are affixed along the sidewalk and can remain in the same locations on a nearly permanent basis," and argues that such semi-permanent placement should be considered to fall within the statute's "fixed location." Defendant also argues that the newsracks do provide "support" or "shelter" to newspapers.

Defendant's arguments have some force. The statute does not appear to be as limited as plaintiffs contend, particularly in light of the suggestive list included in the definition. Plaintiffs seem to suggest that the statute limits the Commission's jurisdiction to structures that "support" or "shelter" human beings, as opposed to supporting or sheltering objects. But the inclusion of "flagpoles" undermines this contention. Nor does the statute appear to apply only to those things that are permanently fixed, as opposed to attached less firmly. The inclusion of "tents" is inconsistent with plaintiffs' proposed narrower meaning. Similarly, the inclusion of "platforms" and "bins" within the list of suggested "structures" supports defendant's contention that newsracks are within the definition. Because I have determined for other reasons, discussed below, that the statute does not authorize the Commission's adoption of the Street Furniture Guideline, I will assume *arguendo,* without so deciding, that newsracks are "structures."

## B. The Commission's Power to Issue Substantive Regulations

### 1. The Meaning of "Substantive" in this Context

The precise meaning of the term "substantive" depends upon, among other factors, the context of use. In relation to this inquiry into statutory delegation to the Commission, a basic question is whether the statute authorizes the Commission to adopt rules that state substantive criteria for determining whether individual applications will be granted, or instead merely authorizes the Commission to adopt rules regarding either its own internal operations or the procedures that apply to the processing and decision of individual applications under substantive criteria defined in the statute or elsewhere in the law. Authority for "substantive rulemaking" in this sense is authority to make one form of substantive law. It is, in essence, substantive lawmaking authority, in contrast with rulemaking authority in the narrower sense of authority to make procedural rules for hearing and deciding applications in which the decisionmaker will be applying substantive law defined elsewhere. A distinction in this sense between substantive rulemaking and procedural rulemaking is the way I use the terms throughout this Opinion.

### 2. Statutory Authority and Basic Contentions of the Parties

Under 1955 Mass.Acts c. 616 § 7, no person may "construct[,] ... reconstruct or alter" any exterior architectural feature without having filed an application with the Commission for a certificate of appropriateness. The section provides that

> [i]n passing upon appropriateness, the commission shall consider, in addition to any other pertinent factors, the historical and architectural value and significance,

architectural style, general design, arrangement, texture, material and color of the exterior architectural feature involved and the relationship thereof to the exterior architectural features of other structures in the immediate neighborhood.

The statute provides several procedural mechanisms under which the Commission may conduct its review of exterior architectural features of structures. Under section 5, a certificate of appropriateness issued by the Architectural Commission is a prerequisite to a building permit; the building commissioner is prohibited from issuing a building permit for the "construction" or "reconstruction, alteration or demolition" of "any structure" in the district unless the application for such a permit is accompanied by such a certificate. Section 11 provides that persons who construct, alter, or demolish any exterior architectural features in violation of the act shall be punished by a fine of not less than fifty dollars nor more than one thousand dollars; the Architectural Commission may obtain a restraining order in the Superior Court. A subsequent amendment provides that anyone who "maintains" any exterior architectural feature in violation of the act may also be fined up to one hundred dollars a day. 1965 Mass.Acts c. 429 § 8. Under section 7A, added by 1963 Mass.Acts c. 622 § 3,

> [n]o permit to erect a sign, marquee, awning, or other exterior architectural feature protruding from any structure in the Historic Beacon Hill District shall be issued by the public improvement commission of the city of Boston, or by any other agency now or hereafter authorized to issue such permits, unless the application for such permit shall be accompanied by a certificate of appropriateness issued under section seven.

In 1965, the legislature amended section 4 of the 1955 enabling act by adding that "[t]he commission may adopt, amend and repeal rules for the regulation of its affairs and the conduct of its business."

Defendant contends that by this 1965 amendment the legislature delegated to the Commission express power to promulgate substantive rules and regulations as to the appropriateness of exterior architectural features in the District. Defendant contends in the alternative that if the legislature did not expressly grant authority to issue substantive regulations, such authority was implied by a legislative delegation to the Commission of broad discretion and flexibility. Lastly, defendant contends in the alternative that if such authority was not implied from a broad delegation to the Commission of discretion and flexibility, such authority was a necessary implication of the sum of the powers expressly authorized.

Plaintiffs argue that the enabling statute does not confer upon the commission broad discretion to promulgate substantive regulations, but only the discretion to consider whether a particular application to construct, alter, or reconstruct an "exterior architectural feature" is historically or architecturally appropriate as that concept is explicitly and implicitly defined in the statute.

### 3. The Precise Issue Before the Court

To evaluate the merits of these opposing contentions as they apply to the present case, I consider first precisely what issue is before this court on the facts presented. Plaintiffs have never applied for certificates of appropriateness, possibly in the belief that newsracks were not "structures" covered by the enabling act, or in the belief that, even if newsracks were "structures," the First Amendment prohibited the Commission from regulating the placement of newsracks. Defendant did not, however, order the removal of the newsracks on the ground that plaintiffs had failed to apply for the certificates.

Instead, defendant ordered the removal of all newsracks on the basis of a rule that purports to treat a class of structures— "street furniture," including plaintiffs' newsracks—as *per se* inappropriate, without regard to the exterior architectural features of a particular item within the class. Defendant has not left open the possibility that any newsrack might be found to be appropriate. Indeed, defendant has taken the position that the "street furniture" ban survives First Amendment attack precisely because the guideline bars all newsracks without excep-

tion (this contention is discussed below in part V).

Thus, in this case I need not decide whether the Commission may require that plaintiffs seek certificates of approval for their newsracks. The only issue of state law before the court, precisely stated, is whether the Commission has the authority to issue a regulation that purports to bar every newsrack without regard to the distinctive exterior architectural features of any particular newsrack.

### 4. Is the Express Conferral of Rulemaking Authority Substantive or Procedural?

■ Plaintiff contends that the legislature has expressly delegated substantive rulemaking authority to the Commission. Parsing the phrase "rules for the regulation of its affairs and the conduct of its business," defendant argues that to read "conduct of its business" to refer only to the conduct of internal procedural matters would render the phrase "regulation of its affairs" superfluous. Defendant urges this court to interpret the phrase "conduct of its business" to refer to the entire range of substantive authority of the Commission to review exterior architectural features.

The better interpretation of the statute, however, is that it conferred only procedural rulemaking power on the Commission. This interpretation is consistent with the normal usage of words, the placement of the relevant rulemaking provision in the larger statute, and the case law in existence at the time the statute was drafted.

Defendant is incorrect in arguing that to read the statute as conferring only procedural rulemaking power is to render the phrase "rules ... for the conduct of its business" superfluous. One can read the phrases "rules for regulation of its affairs" and "[rules for the] conduct of its business" in a manner that gives distinctive meaning to each of the two phrases without reading either phrase to confer substantive rulemaking authority. Each clause may be read as referring to a set of internal matters different from the set of internal matters of the Commission to which the other refers. For example, "[rules for the] conduct of its busi-

ness" might refer to parliamentary procedures of the Commission, whereas "rules for the regulation of its affairs" might refer to the interactions between the members of the Commission and the appointed staff of the Commission.

It is noteworthy that the 1965 amendment placed the rulemaking provision in section 4 of the 1955 act. Section 4 concerns the number of members of the Commission, the manner of their appointment and terms of service, the times of meeting, the selection of the chairman and vice chairman, and other matters having to do with internal procedures and practices. This suggests that the rulemaking authority extends only to internal matters, not to the substantive power of the Commission to review architectural features (when considering an application for a certificate), a power conferred in other sections of the enabling act.

The cases do not support defendant's interpretation of "conduct of its business." Defendant cites *National Petroleum Refiners Association v. FTC*, 482 F.2d 672 (D.C.Cir.1973) *cert. denied* 415 U.S. 951, 94 S.Ct. 1475, 39 L.Ed.2d 567 (1974), as a case "similar to the case at bar" in which a "liberal approach to construing an agency's ability to promulgate substantive guidelines" was taken. In that case, however, the court was construing a statute that granted to the Federal Trade Commission the power to "make rules and regulations for the purposes of carrying out the provisions" of the statute. Those words are far more susceptible to the interpretation that they grant substantive rulemaking authority than are the words at issue here. Defendant cites no case in which the grant of authority to make rules for the "conduct of its business" has been read as conferring substantive rulemaking authority of the kind defendant suggests. Indeed, Massachusetts cases decided before 1965 indicate that the phrase was commonly used to refer at most to the internal management of an entity (governmental or private), if not strictly to matters of procedure.

*See, e.g., Ins. Co. of North America v. Comm'r of Ins.*, 327 Mass. 745, 749, 101 N.E.2d 335, 338 (1951) (commissioner of

insurance shall grant a license as a rating organization to any applying entity if that entity is found to have adopted a "constitution, articles of agreement or association or certificate of incorporation, and [to have adopted] by-laws, *rules and regulations governing the conduct of its business* conform[ing] to the requirements of law") (citing G.L. (Ter.Ed.) c. 174A) (emphasis added);

*Burt v. Municipal Council of Taunton,* 275 Mass. 535, 176 N.E. 511, 513–14 (1931) (characterizing a municipal order creating a process for bidding on city contracts as a rule for "the conduct of the general business affairs of the city.");

*Tapper v. Boston Chamber of Commerce,* 249 Mass. 235, 144 N.E. 89, 92–93 (1924) (Power of directors of Chamber to make a charge to members who use trading facilities of the Chamber was authorized by an article of the by-laws which gave the directors the "management of the affairs of the chamber ... and the power to 'adopt or amend rules and regulations for the government and proper business conduct of the chamber'");

*Farnham v. Lenox Motor Car Co.,* 229 Mass. 478, 118 N.E. 874 (1918) (Although "the power of the superior courts is ample to make rules regulating practice and procedure, expediting the trial of causes and the general conduct of its business" (citing R.L. c. 158 § 3), such power does not extend to the power to deny parties the substantive right to have controverted facts decided by a jury).

I hold that the legislature did not expressly confer substantive rulemaking authority on the Commission.

### 5. Do Substantive Regulatory Powers Arise by Implication?

■ Defendant cites *Greater Boston Real Estate Board v. Boston,* 397 Mass. 870, 494 N.E.2d 1301 (1986), for the proposition that even if the grant of rulemaking power is not expressly substantive, where there is some grant of rulemaking power and the agency is granted "broad discretion and flexibility," substantive rules will be upheld if they are "reasonably related" to the purpose of the agency.

Defendant has stated the law in terms that are too sweeping. *Greater Boston Real Estate Board* did not turn solely on whether the legislative grant of authority to an agency involved "broad discretion and flexibility." The decision turned at least in part on whether the legislative authorization was to an "administrative agenc[y]" to make "administrative regulations," or instead to a municipality, to make an "ordinance or by-law" outside the scope of the Home Rule Amendment. *Id.,* 494 N.E.2d at 1305–6.

Defendant calls attention to those cases cited in the *Greater Boston Real Estate Board,* in which authority was conferred upon a statewide agency, and argues that they support the proposition that the Street Furniture Guideline should be upheld if it is "reasonably related" to the purpose of the Commission's enabling legislation.

*See Levy v. Board of Registration and Discipline in Medicine,* 378 Mass. 519, 524, 392 N.E.2d 1036 (1979);

*Consolidated Cigar Corp. v. Dept. of Public Health,* 372 Mass. 844, 855, 364 N.E.2d 1202 (1977).

In *Greater Boston Real Estate Board,* the court distinguished from cases of implied substantive rulemaking power those in which the legislature had, by special statute, conferred upon a particular municipality certain powers that were not otherwise conferred upon municipalities generally under the Home Rule Amendment (an example is the power to control rents in the community).

*Flynn v. Cambridge,* 383 Mass. 152, 156–59, 418 N.E.2d 335 (1981);

*Grace v. Brookline,* 379 Mass. 43, 399 N.E.2d 1038 (1979);

*Church v. Boston,* 370 Mass. 598, 601, 351 N.E.2d 212 (1976).

In these situations, the "reasonably related" test does not apply; a rule is upheld only if the legislative declaration *expressly* authorizes it, or if the rule

is *necessary* to effectuate the legislative intent embodied in the statute relied on as the source of municipal power. A reason-

able relationship between the ordinance or the by-law and the statute is not enough. *Greater Boston Real Estate Board,* 494 N.E.2d at 1305 (emphasis added).

The Commission is an entity within a larger entity—the municipality. The Commissioners are appointed by the mayor. 1955 Mass.Acts c. 616 § 4. In 1982 Mass.Acts c. 624 § 1, the legislature established an "environment department" in the City of Boston, to provide support staff and resources to identified "city commissions," including the Beacon Hill Architectural Commission. The Commission does not derive its authority from the exercise by the City of Boston of the City's powers under the Home Rule Amendment, but rather from a special legislative grant of authority. Thus, the authority for the regulation at issue in this case must be supported by the less expansive "necessary implication" standard, and not merely by the "reasonably related" standard, as these standards are used by the Supreme Judicial Court when interpreting state statutes.

Even if the Commission were to be considered an independent administrative agency, however, defendant has not made any showing that the legislative grant of authority to the Commission involved the sort of "broad discretion and flexibility" that is associated with the more expansive "reasonably related" standard. Defendant suggests that such "broad discretion and flexibility" can be found even where there is no express grant of substantive rulemaking authority. But the cases defendant cites do not support that proposition. In each of those cases, the statute explicitly stated that the agency's power was to make rules to effectuate the substantive purposes of the legislation. *Levy,* 392 N.E.2d at 1038–40 (citing St. 1975, c. 362, § 3) (statute provided that "after proper notice and hearing, [entity may] adopt rules and regulations governing the practice of medicine in order to promote the health, welfare, and safety") . *Consolidated Cigar Corp.,* 364 N.E.2d at 1205 (department promulgated migrant worker sanitation regulations pursuant to mandate of G.L. c. 111 § 127A mandate [that the department adopt "public health

regulations ... hav[ing] the force of law"]);

*Mourning v. Family Publications Service,* 411 U.S. 356, 361–62, 93 S.Ct. 1652, 1657, 36 L.Ed.2d 318 (1973) (relevant statutory provision provided that "[Federal Reserve] Board shall prescribe regulations to carry out the purposes of [the Act] ... [and] to prevent circumvention or evasion thereof, or to facilitate compliance therewith");

*Thorpe v. Housing Authority of Durham,* 393 U.S. 268, 277, 89 S.Ct. 518, 523, 21 L.Ed.2d 474 (1969) (enabling statute authorized HUD "from time-to-time [to] make, amend, and rescind such rules and regulations as may be necessary to carry out the provisions of this Act").

As was determined above in part IV.B.4, there was no express conferral of substantive rulemaking authority here.

Furthermore, even if this court were to accept defendant's contention that sufficient "discretion and flexibility" to justify application of the "reasonably related" standard could be shown absent an explicit grant of substantive rulemaking authority, defendant has failed to show here that the legislative grant of authority to the Commission involved such discretion and flexibility.

In claiming that such discretion and flexibility was granted, defendant relies primarily on the following legislative mandate:

In passing upon appropriateness, the Commission shall consider, in addition to any other pertinent factors, the historical and architectural value and significance, architectural style, general design, arrangement, texture, material and color of the exterior architectural feature involved *and the relationship thereof to the exterior architectural features of other structures in the immediate neighborhood.*

1955 Mass.Acts c. 616 § 7 (emphasis added).

This mandate is more appropriately read as a direction to the Commission about its substantive standards for deciding case by case whether or not to grant each application submitted to it. The phrase emphasized in the foregoing quotation strongly supports this inference. It is true, as defendant ar-

gues, that these aesthetic and historical considerations necessarily involve subjective judgments; thus the Commission has a certain amount of discretion in deciding the architectural appropriateness of individual applications. It does not follow, however, that this discretion extends so far as to empower the Commission to issue a regulation that purports to prohibit an entire class of structures without regard to the exterior architectural features of the structures or the relationship of their features to the features of other structures in the immediate neighborhood.

Indeed, the specific mandate of the legislature is to the contrary. The statute mandates that the Commission consider the various factors listed above, not only with regard to the architectural features of a structure described in an individual application, but also in regard to the immediate neighborhood in which that structure is to be placed. Furthermore, the enabling act states quite precisely the process the Commission must follow in reviewing proposed exterior architectural features. That is, the enabling act spells out procedures for acting upon applications for certificates of appropriateness, setting the number of days after the filing of an application, the notice that must be given, the time within which a public hearing must be held, and other procedural matters. 1955 Mass.Acts c. 616 § 7. These directives would be out of place in a statute entrusting the Commission with substantive lawmaking authority.

Defendant's contentions do, nevertheless, have a certain facial plausibility. If, after all, the legislature has charged the Commission to review the exterior architectural features of structures based on criteria that are essentially subjective matters of taste, in which courts have no particular expertise, why should the Commission not have the power to issue substantive regulations that inject some regularity and predictability into the review process? Furthermore, if the Commission has the power to reject any individual structure based on an entirely subjective decision that the exterior architectural features are "inappropriate," why should it not have the power to declare certain types of structures

to be inherently inappropriate? In other words, does not the Commission's legislative mandate "necessarily imply" the power to issue such regulations?

I conclude that the answer must be negative. Although the criteria spelled out in the statute do involve subjective matters of taste, the legislation nowhere manifests an intent to confer unfettered discretion on the Commission. The enabling act requires the Commission to "spread upon [its] records" the reasons for its decisions, and recommendations, if any. 1955 Mass.Acts c. 616 § 7. The act further provides that any applicant aggrieved by a determination may appeal to the superior court, which may find that "the reasons given by the commission" are "unwarranted by the evidence" or "insufficient in law" to warrant the determination. Although matters of taste are ones in which the courts have no particular expertise, the legislature nevertheless manifested an expectation that the courts be available to exercise a restraining role of judicial review over Commission decisions, case by case. Courts cannot perform that function unless the Commission states for the record its reasons for each decision.

Since the statute spelled out in precise terms the procedures to be followed by the Commission, it manifests a legislative mandate not to extend the Commission's powers as far as defendant contends. The substantive considerations identified by the legislature as the proper basis for determining "appropriateness" are inherently incapable of being defined or specified in strictly objective standards. In stating with precision the procedures that the Commission was to follow, the legislature manifested an intent to cabin the scope of the Commission's discretion. Thus it is particularly appropriate for the court to consider in this case whether the Commission has deviated from the procedures spelled out by the legislature.

Since this court has jurisdiction over the state law portion of this claim, it is in a position to review the Commission's actions as would a state court. This case, however, does not present an issue of judicial review of Commission action on an individual certification application. Rather, the court must re-

view a blanket declaration by the Commission that entire categories of applications will be decreed inappropriate in advance. In so ruling, the Commission has necessarily failed to consider the individual exterior features of the structures involved in each of those applications, and has also failed to consider the context of the neighborhood in which each structure is located. On this basis alone, it is appropriate for this court to determine that the Commission's "reasons," if indeed it can be said on this record that the Commission has disclosed them, are "insufficient in law" to sustain its Street Furniture Guideline.

The foregoing analysis does not necessarily mean that the Act prohibits the Commission from developing internal guidelines that enable it to develop some consistent approach to recurring issues presented by the flow of applications for approval of particular types of exterior architectural features, and to give applicants some sense as to what the Commission will be requiring. To defendant's credit, it appears that, to a large extent, this may have been an intended function of the guidelines generally, as distinguished from this one in particular. The guidelines almost exclusively deal with exterior surface features of structures and not with more basic characteristics of the structures themselves.

See, e.g., Roof and Roof Structure Guideline 5 ("[u]npainted mill-finished aluminum is inappropriate ... and shall not be used for flashing, gutters, and downspouts").

It is noteworthy that the guidelines are prefaced by the following comment: "Each application is considered on its individual merits, but the Beacon Hill Architectural Commission will act in accordance with the following guidelines." It is also noteworthy that a great many guidelines (although not all) are written in terms that suggest that they are indeed only *guidelines,* not firm rules or commands, and that individualized review is necessary before a final determination can be made.

See, e.g., Introductory Guideline 5 ("[c]ontemporary design for new buildings may be considered if [it] is of excellent quality and is compatible with [surroundings]");

Roof and Structure Guideline 4 ("roof decks ... that are visible from the public way are *discouraged*") (emphasis added).

There are some exceptions. For example, the regulation prohibiting all free-standing signs, like the Street Furniture Guideline, purports to bar an entire category of structures without regard to the exterior architectural features of those structures. The Commission in its submissions to the court notes that the prohibition of publication distribution boxes, and later of street furniture, is consistent with the sign regulation. The Commission does not, however, point to any clearer source of authority for the free-standing sign regulation than for the Publication Distribution and Street Furniture Guidelines.

To the extent that the guidelines contain a disclaimer that purports to preserve the right of applicants to an individual adjudication of the appropriateness of their structures, this does not save the Street Furniture Guideline from the challenge mounted by plaintiffs in the present case. Despite the disclaimer, defendant has taken the legal position that it can and has barred all newsracks under the Street Furniture Guideline. For the reasons stated above, I hold that the Commission, in seeking to exercise that power, has exceeded its authority under state law.

## V. First Amendment Question

### A. Introduction

Plaintiffs assert that the Commission's order that their newsracks be removed violated plaintiffs' First Amendment rights, for which a remedy is available under 42 U.S.C. § 1983.

■ The First Amendment protects not only the right to publish materials, but also the right to distribute them. *Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938). This does not mean, however, that one has an absolute right to distribute materials in any manner one chooses. *Breard v. Alexandria,* 341 U.S. 622, 642, 71 S.Ct. 920, 932, 95 L.Ed. 1233 (1951) (cited in *Lakewood,* 486 U.S. at 778, 108 S.Ct. at 2155 (White, J. dissenting)).

Defendant characterizes plaintiffs as seeking to establish a First Amendment right to "appropriate public property for their exclusive use" by virtue of their status as newspaper publishers. Defendant contends that although no Supreme Court case is directly on point, five of the Justices "have held that there is no First Amendment right for newsracks to occupy the public sidewalks." (Def's Brief Supp.Mot.Recons. at 6.)

In reaching the count of five Justices, defendant draws upon two dissenting opinions. Dissenting in *Lakewood v. Plain Dealer Pub. Co.,* 486 U.S. 750, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988), Justice White, joined by Justices Stevens and O'Connor, stated:

> I believe that the First Amendment does not create a right of newspaper publishers to take a portion of city property to erect a structure to distribute their papers. There is no constitutional right to place newsracks on the city sidewalks over the objections of the city.

*Id.* at 784, 108 S.Ct. at 2158. Chief Justice Rehnquist and Justice Kennedy took no part in that decision. Dissenting in *Cincinnati v. Discovery Network, Inc.,* — U.S. ——, 113 S.Ct. 1505, 123 L.Ed.2d 99 (1993) however, the Chief Justice, joined by Justices White and Thomas, stated:

> In my view, the city may order the removal of *all* newsracks from its public right-of-ways if it so chooses. [Citation to *Lakewood* dissent.] But however it decides to address its newsrack problem, it should be allowed to proceed in the manner and scope it sees fit so long as it does not violate established First Amendment principles, such as the rule against discrimination on the basis of content.

*Id.* at ——, 113 S.Ct. at 1525 (emphasis in the original).

It is not true that five Justices, sitting at the same time, have ever expressed a view, much less "held," that "there is no First Amendment right for newsracks to occupy the public sidewalks." Even when we put aside the error of treating the view expressed by a total number of dissenting Justices, sitting at different times, as a holding of the Court, however, the point remains that among the present Justices of the Supreme Court, all except Justice Ginsburg have either joined in one of the two dissenting opinions just cited—which endorsed the proposition just quoted—or have joined in one of the majority opinions in those cases—which declined to rule on the validity of that proposition.

> *See Lakewood*[,] 486 U.S. at 762 n. 7, 108 S.Ct. at 2147 n. 7 (majority opinion) (Brennan, J. writing for himself and Marshall, Blackmun, and Scalia, JJ.) (reserving the question);
>
> *id.* at 784, 108 S.Ct. at 2158 (dissenting opinion of White, J., writing for himself, Stevens, J. and O'Connor, J.) (agreeing with the proposition);
>
> *Cincinnati,* — U.S. at ——, 113 S.Ct. at 1516 (majority opinion) (Stevens, J., writing for himself and Blackmun, O'Connor, Scalia, Kennedy and Souter, JJ.) (reserving the question);
>
> *id.* at ——, 113 S.Ct. at 1525 (dissenting opinion of Rehnquist, C.J. writing for himself, White, and Thomas, JJ.).

Nevertheless, in both *Lakewood* and *Cincinnati* the majority of the Court held that the municipal ordinance regulating the placement of newsracks on public property violated the First Amendment. In *Lakewood,* the ordinance had authorized the mayor to grant or deny applications for annual permits for publishers to place newsracks on public property, and to state his reasons for so doing. 486 U.S. at 753, 108 S.Ct. at 2142. The Court held that the regulation violated the First Amendment because it posed an unacceptable risk of content-based censorship by placing essentially unfettered discretion in the hands of the mayor to grant or deny annual licenses. *Id.* at 759–62, 108 S.Ct. at 2145–47.

In *Cincinnati,* the city had passed an ordinance ordering the removal of newsracks for the distribution of "commercial handbills," but had allowed newsracks containing "noncommercial" newspapers. — U.S. at —— ——, 113 S.Ct. at 1505–09. The Court held that the regulation constituted impermissible content-based discrimination under the First Amendment. See discussion below in part V.D. The Court also held that the ordinance

was not narrowly tailored. See discussion below in part V.C.

The *Cincinnati* opinion was written by Justice Stevens and joined by, among others, Justice O'Connor, thus speaking for two of the Justices who joined Justice White's dissent in *Lakewood.* In *Cincinnati* the Court declined to decide whether the city could ban all newsracks outright. The Court assumed *arguendo* that the city could do so, but reasoned that

> as long as this avenue remains open, these devices continue to play a significant role in the dissemination of protected speech.

*Id.* at ——, 113 S.Ct. at 1516.

Defendant argues that since the Street Furniture Guideline (as well as the Publication Distribution Guideline) is a total ban, it withstands constitutional scrutiny. There is no licensing scheme involving excessive discretion, as in *Lakewood,* thus no specter of municipal censorship. No distinction is drawn between different sorts of publications, as in *Cincinnati.* Thus, defendant argues, there is no problem of content-based discrimination. Defendant contends that the Street Furniture Guideline avoids these pitfalls that proved fatal in those two cases, and that this case therefore squarely presents the situation discussed in the two dissenting opinions.

■ Although defendant's argument is facially plausible, it is nevertheless flawed. Defendant draws more sweeping inferences from the two dissenting opinions cited than their text supports. It is of course true that there is "no First Amendment right" to place newsracks on public property; that is, the First Amendment does not confer an absolute right to do so. This conclusion may be explained, however, as merely an application of the general principle that the First Amendment does not confer an absolute right to express oneself when, where, and however one chooses; rather, it permits the government to regulate the time, place, and manner of speech if certain requirements are met.

It is not helpful, therefore, to frame the issue here as being whether plaintiffs have an absolute right to place newsracks on public property. The question is, instead, whether the government has shown a sufficient basis for a regulation—the Street Furniture Guideline—that restricts plaintiffs' distribution of newspapers.

■ The Supreme Court has applied different tests to regulations of speech, depending on whether the regulation applies to speech in a public forum, a nonpublic forum, or a private forum. Where the regulation applies to a public forum, the applicable test is whether the regulation is

> content-neutral, [is] narrowly tailored to serve a significant governmental interest, and leave[s] open ample alternative channels of communication.

*Perry Education Association v. Perry Local Educators' Association,* 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).

■ The streets and sidewalks of the Historic Beacon Hill District are a public forum.

> *United States v. Grace,* 461 U.S. 171, 179, 103 S.Ct. 1702, 1708, 75 L.Ed.2d 736 (1983) (sidewalks around perimiter of Supreme Court grounds, which are "indistinguishable from any other sidewalks in Washington, D.C.," are a public forum);

> *Hague v. CIO,* 307 U.S. 496, 515–16, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (opinion of Roberts, J.) ("streets and parks" have been held in trust for purposes of assembly and communication since time immemorial and are therefore public fora for First Amendment purposes).

Thus for the Street Furniture Guideline to be upheld, it must meet the four requirements (content-neutrality, significant interest, narrow tailoring, and ample alternative channels) of the test outlined in *Perry.*

## B. The State's Justification for the Street Furniture Guideline

### 1. The Preservation of Public Property as a Justification

I assume in defendant's favor that

> [t]he State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated.

*Adderly v. Florida,* 385 U.S. 39, 47, 87 S.Ct. 242, 247, 17 L.Ed.2d 149, *cited in Lakewood* 486 U.S. at 781, 108 S.Ct. at 2157 (dissenting opinion of White, J.). Defendant, however, has failed to show that the Street Furniture Guideline is supportable as an exercise of that power.

■ As explained above, the powers exercised by the Commission are not the general-purpose powers of a municipality under the Home Rule Amendment. Rather, the Commission has only the limited powers specially conferred by the legislature. The Commission has not shown that the legislature conferred on the Commission general regulatory power over the use of public property within the District.

The legislature has conferred a variety of powers *directly upon municipalities* under the Home Rule Amendment. These powers include the power to regulate, or to exercise a proprietary interest in, the public ways within their boundaries.

*See, e.g.,* Mass.Gen.L. c. 40 § 44 (municipality may establish an improvement district for … building and maintaining sidewalks);

c. 41 § 62 (duties of municipal highway surveyor, including control of the ordinary repair of public ways in his town);

c. 41 § 64 (powers of road commissioners relative to public ways, monuments at the termini an angles thereof, guide posts, sidewalks and shade trees);

c. 41 § 66 (powers of superintendent of streets, if no highway surveyor or road commissioner appointed);

c. 86 § 3 (power of county commissioners or board or officer having authority over [public] ways to remove encroachments on public ways).

The parties to this case agree that the elected officials of the City of Boston have considered enacting an ordinance regulating the placement of newsracks on public property, but have declined to do so.

That the legislature has granted the Commission some *limited* powers that the Commission may exercise throughout the geographic area of the District does not imply that it has *general* powers within that district.

*Cf. Harrison v. Textron, Inc.,* 367 Mass. 540, 328 N.E.2d 838, 843 (1975) (although a municipality is subject to its own zoning regulations, there is no authority for the proposition that a public way, laid out by municipal action, pursuant to statute, may be used only for purposes which are permitted in the zoning district in which the public way lies).

Evidence that the Commission itself recognizes that it has no general regulatory or proprietary power over the public ways in the district appears in the careful wording of the Street Furniture Guideline, which implicitly recognizes that other (unnamed) "public agencies" have the authority to place "street furniture" for "public safety and/or public welfare purposes." The Commission does not purport to exercise any authority to place or not place "public" furniture; the only authority asserted by the Commission is to determine on review whether the furniture is "in keeping with the architectural and historic character" of the District.

### 2. Public Safety as a Justification

Precedents support the proposition that the interest in public safety is one that may be weighed in determining whether a regulatory burden on speech is justified.

*See, e.g., Heffron v. Int'l Soc. for Krishna Consciousness,* 452 U.S. 640, 651, 101 S.Ct. 2559, 2566, 69 L.Ed.2d 298 (1981) (more restrictive time, place, and manner regulation is justified on a fairgrounds than on a street because of the greater "flow of the crowd and demands on safety" at the fair);

*Hague v. C.I.O.,* 307 U.S. 496, 516, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939) (concurring opinion of Roberts, J.) (the right to communicate in a public forum "is not absolute, but relative, and must be exercised … in consonance with peace and good order).

No contention is raised here, however, that the Commission is a regulatory body authorized to act to serve the State's interest in maintaining public safety.

### 3. The Control of Visual Clutter as a Justification

The Commission asserts that the Street Furniture Guideline serves the governmental interest of preventing visual clutter or blight. This has been recognized as a significant governmental interest that may in some circumstances justify a regulation of speech. *See, e.g., City Council v. Taxpayers for Vincent*, 466 U.S. 789, 808, 104 S.Ct. 2118, 2131, 80 L.Ed.2d 772 (1984).

Defendant's mandate under state law does not constitute a sweeping authorization to regulate all forms of visual blight—for example, defendant has no authority to regulate littering, *see Schneider v. State*, 308 U.S. 147, 60 S.Ct. 146, 84 L.Ed. 155 (1939). I assume *arguendo*, nevertheless, that defendant's authority to review architectural and historical appropriateness is aimed at a form of "esthetic harm" that in some circumstances would justify a narrowly-tailored regulation of speech.

> *See Vincent*, 466 U.S. at 808, 104 S.Ct. at 2131 (ordinance banning posting of signs on utility poles and similar public fixtures held to be narrowly tailored to protect city's interest in "eliminating visual clutter");
>
> *See also Metromedia v. San Diego*, 453 U.S. 490, 510–12, 101 S.Ct. 2882, 2893–95, 69 L.Ed.2d 800 (1981) (plurality opinion) (city has a valid interest in regulating billboards to avoid "esthetic harm," although ordinance that banned offsite advertising billboards but permitted onsite ones was not a permissible method of protecting that interest).

### C. The "Narrow Tailoring" Requirement (and Related "Reasonable Fit" Requirement)

▮ The *Perry* test requires that time, place, and manner restrictions be "narrowly tailored" to serve a significant governmental interest. There are some circumstances, however, in which the Supreme Court has applied a slightly different test to regulations of "commercial speech." In those circumstances, the Court imposes instead a requirement that the regulation bear a "reasonable fit" to the governmental interest. *State Univ. of New York v. Fox*, 492 U.S. 469, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989). The concepts of "narrow tailoring" and "reasonable fit" have somewhat different meanings, but in common they serve as methods of analysis of the relationship between the state interest (or interests) advanced to justify a regulation and the regulatory instrument (or instruments) the regulator chooses to use for that purpose. For reasons discussed below, I determine that the Street Furniture Guideline does not meet either test, and therefore violates plaintiffs' First Amendment rights.

The Supreme Court has explained that the requirement that a regulation be "narrowly tailored" is not as stringent as requiring the regulation to be "the least restrictive means" of regulating the speech. *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S.Ct. 2746, 2758, 105 L.Ed.2d 661 (1989). Instead, the regulation will be valid if it does not burden "substantially more" speech than is necessary to further the governmental interest. *Id.* Thus, *Ward* held that a city could achieve its interest in preventing excessive noise at outdoor rock concerts by providing city-hired sound technicians. *Id.* at 800–02, 109 S.Ct. at 2758–60. Although the city might have adopted alternatives that gave the performers direct control over sound-mix, the means provided by the city were not "substantially more burdensome" than those alternatives, because the city-appointed technicians were directed to defer to the sound-mix instructions given them by the performers.

Defendant argues that insofar as its regulation applies to the Tab, which is a free publication, the regulation need only meet the "reasonable fit" test applied to commercial speech. Defendant has not shown, however, that there is any reason to consider the Tab to be speech that is any more "commercial" or less "noncommercial" than the newspapers published by the other plaintiffs. The fact that it is a free publication is not a sufficient ground for drawing such an inference. There is no showing, for example, that the Tab involves a higher content of advertising than the other papers, which is not to say that even such a showing would be sufficient

to justify drawing a "commercial"/"noncommercial" distinction.

See Cincinnati, —— U.S. at ——, —— & n. 19, 113 S.Ct. at 1511, 1513 & n. 19 (difficulty of drawing bright lines between commercial and noncommercial publications based on proportion of advertizing to editorial copy).

Even if it were shown that the Tab is a commercial publication, that would not necessarily mean that a regulation aimed at preventing visual blight by controlling the dissemination of the Tab would be reviewed under a standard of scrutiny different from that applied to regulation of other papers. The distinction between "commercial" and "noncommercial" speech would be relevant only if the regulation at issue were aimed at the underlying commercial transaction proposed by the "commercial" speech. Cincinnati, —— U.S. at —— - —— & n. 21, 113 S.Ct. at 1511–15 & n. 21.

Interestingly, the Court in Cincinnati, after explaining why the less stringent "reasonable fit" test was inapplicable, applied that test anyway, assuming arguendo that it was applicable. Id. at ——, 113 S.Ct. at 1509–16. Since the "reasonable fit" requirement is at least nominally more favorable to the governmental entity than the "narrow tailoring" requirement, the determination of the Court that the newsrack regulation in that case did not survive even the "reasonable fit" test meant that the regulation would not survive the "narrow tailoring" requirement, either. Id. at ——, 113 S.Ct. at 1517 ("city's newsrack policy is not, as demonstrated in [the discussion of the 'reasonable fit' test] 'narrowly tailored' "). I take the same approach, assuming arguendo that the "reasonable fit" requirement applies, here. I conclude that defendant has failed to show that the regulation meets that requirement, and as well that defendant has not shown the regulation to be "narrowly tailored."

In considering whether the regulation met the "reasonable fit" test, the Court in Cincinnati noted that the fact that the city had not regulated the "size, shape, appearance, or number" of newsracks "indicates that it has not 'carefully calculated' the costs and benefits associated with the burden on speech imposed by its prohibition." Id. at ——, 113 S.Ct. at 1510. The Court noted, with apparent approval, the finding of the district court that "the practices in other communities" indicated that the city might have adequately protected its esthetic interests by so regulating size, shape, number, or placement. The Court explained that its considering these alternatives did not mean that the Court was imposing a "least restrictive means" test, because although the alternative chosen by the city need not be the "absolutely ... least severe," the alternative chosen would not pass constitutional muster if there were "numerous and obvious less-burdensome alternatives" available. Id. at —— n. 13, 113 S.Ct. at 1510 n. 13.

I will assume arguendo that the Commission's esthetic interest is greater than that of the average community, because Beacon Hill has been designated a special historic district. Nevertheless, it is apparent, even on the face of the Street Furniture Guideline, that the regulation is not sufficiently narrowly-tailored to this interest. The Street Furniture Guideline assumes that "street lights, traffic lights, mail boxes, fire hydrants, street trees, and trash receptacles," can be designed in such a fashion that they will be "in keeping with the architectural and historic character of the District." The same is true for store-front merchandise stands. Defendant has shown no reason why its interest in preserving the architectural and historic character of the district cannot be met by, for example, subjecting newsracks and other street furniture to the same review process as store-front merchandise racks. There is no showing that newsracks are any more inherently out of keeping with the architectural character of the Beacon Hill district than other modern innovations that have been approved by the Commission on the basis of their external design features. The record shows that cable television connections have been approved, subject to certain guidelines governing the external appearance of cable boxes and wiring (Agreed Stmt. Facts, exh. L), and that new traffic control boxes have been approved, subject to restrictions regarding paint color, pedestals, and

paving materials (Agreed Stmt. Facts, exh. K).

I conclude, therefore, that the Street Furniture Guideline burdens substantially more speech than is necessary to serve the Commission's interest in preserving the character of the District and that the guideline therefore violates the First Amendment. In so concluding, I do not suggest that there is any particular way in which the Commission may or must seek to maintain the historic and architectural character of the District. I have cited the preference given to "public" street-furniture and store-front stands only as evidence that the regulation chosen by the Commission is not a reasonable fit and is not narrowly tailored. Whether any future regulation of newsracks might be consistent with the Constitution is a question to be faced, if at all, in some other case.

One more point deserves emphasis. In *Cincinnati,* the Court held that a regulation will fail this test if "numerous and obvious less-burdensome alternatives" are available. *Id.* at —— n. 13, 113 S.Ct. at 1510 n. 13. This means, as I understand it, available within the practical power of government. It need not be the case, however, that these alternative means be *legally* available alternatives to the Commission. That is to say, there may be ways in which the newsracks might be regulated that would be a "reasonable fit" and would be "narrowly tailored" to preserving the historical and architectural character of the District, but which are beyond the scope of the Commission's authority. That these hypothetical regulatory schemes are beyond the Commission's authority under existing statutes does not serve to excuse the Commission and thereby strengthen its position in this case. The "narrow tailoring" inquiry is concerned with whether *the State* has practical alternatives available to it. If the State has such alternatives, but has chosen not to grant the Commission the power to effectuate those alternatives, that is to the Commission's disadvantage, not to its advantage. To hold otherwise would enable the State to circumvent the requirements of the First Amendment by creating entities with carefully-crafted grants of authority to regulate speech in ways that unnecessarily impose burdens on the rights of others.

This Opinion, of course, in no way purports to determine whether some other State or municipal entity has the authority to issue a newsrack regulation. Similarly, this Opinion does not purport to rule on whether such a regulation issued by an agency other than the Commission would violate the First Amendment, or whether a regulation issued by the Commission that differs from the Street Furniture Guideline would violate the First Amendment.

### D. The "Content–Neutrality" Requirement

Defendant asserts that the Street Furniture Guideline is "content-neutral" because it has the effect of totally banning all newsracks from the district. I have already determined that the Street Furniture Guideline is not narrowly tailored, and the outcome I reach is supported on that ground independently of issues regarding content-neutrality. I nevertheless proceed to consider these issues because doing so discloses a second and independent ground for the outcome I reach.

### 1. Does First Amendment Doctrine Create a Perverse Incentive to Regulate *More* Speech?

Justice Stevens in *Cincinnati,* although holding that a regulation that allowed some publications ("noncommercial" ones) and banned others ("commercial" ones) did not survive constitutional challenge, was willing to assume *arguendo* that a total ban on newsracks might be constitutional. Defendant takes this to be a suggestion that the First Amendment flaws of the ordinance in that case would be cured by drafting an ordinance that did not draw such a distinction. (Def.'s Brief Supp. [2d] Mot.Recons. at 3) ("[t]he *Cincinnati* Court strongly implied that the ordinance would have been constitutional if the ban had applied to commercial and non commercial publications alike") (internal citation omitted).

The notion seems strange that a broader ban on speech is more acceptable than a narrower ban. Justice Rehnquist, dissenting in *Cincinnati,* commented on this apparent anomaly:

If (as I am certain) *Cincinnati* may regulate newsracks that disseminate commercial speech based on the interests that it has asserted, I am at a loss as to why its scheme is unconstitutional because it does not also regulate newsracks that disseminate noncommercial speech.... Today's decision, though, places the city in the position of having to decide between restricting more speech—fully protected speech—and allowing the proliferation of newsracks on its street corners to continue unabated. It scarcely seem logical that the First Amendment compels such a result.

— U.S. at ——, 113 S.Ct. at 1525.

From one perspective, at least, this case may be seen as presenting the situation that was not present in *Cincinnati,* namely a regulation that does not distinguish among publications on the basis of content. The present case may also be seen as one in which it is particularly appropriate to address the notion that a broader ban is preferable to a narrower one because that proposition has been urged on this court twice; first, by defendant's contention that the Publication Distribution Guideline is an improvement over the *Cincinnati* ordinance, and second, by defendant's contention that any constitutional defect in the Publication Guideline was cured by broadening the ban further in the Street Furniture Guideline.

Often contentions that a broader ban survives First Amendment challenge where a narrower ban would not are subject to a simple answer: the broader ban, even if content-neutral, is not narrowly-tailored to serve the governmental interest. In the present case, my determination that the Street Furniture Guideline is not narrowly tailored is a sufficient ground for finding that it violates the First Amendment rights of the plaintiffs. Indeed, in *Cincinnati* itself, the hypothetical broader ban discussed by Justice Stevens would apparently have been invalid on the ground that it was not narrowly tailored (and not a "reasonable fit"), which was the alternative basis for the decision in that case.

— U.S. at ——, 113 S.Ct. at 1517.

It is worth noting, also, that precedents regarding time, place, and manner of expression are not appropriately interpreted as establishing a "catch–22," in which regulations will arbitrarily be deemed either "too broad" (not narrowly-tailored) or "too narrow" (content-based), leaving the Government forlornly searching for the regulatory formula that is "just right," and, unlike Goldilocks, never finding it. The two requirements are not contradictory; indeed, they are complementary means of accomplishing one substantive purpose. For reasons stated below, I determine that the Street Furniture Guideline satisfies neither requirement.

## 2. The Interests Vindicated by the Narrow-tailoring and Content– Neutrality Requirements

■ The interests at stake when a regulation of expression is challenged are not only the plaintiff's interests but as well the interests of society. Analysis of a First Amendment challenge involves a weighing not alone of the interests of complaining individuals in expression against the interests of society in regulation (whatever the purposes of regulation may be) but as well the interests of society in free expression. Of course, the party seeking to communicate has an individual liberty interest in self-expression.

*See, e.g. Bridges v. California,* 314 U.S. 252, 270, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941) ("it is a prized American privilege to speak one's mind, although not always with perfect good taste, on all public institutions.")

The individual's liberty interest, however, is not the only interest that weighs in favor of allowing that individual to speak. For although the governmental interest in regulating speech (for whatever purpose) is a social interest, there is also a countervailing social interest in avoiding restraints on public discussion.

*E.g., New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection ... we have staked upon [that presupposition] our all") (internal citation and quotation omitted);

*Roth v. United States,* 354 U.S. 476, 484, 77 S.Ct. 1304, 1309, 1 L.Ed.2d 1498 (1957) (First Amendment "was fashioned to assure unfettered interchange of ideas for the bringing about political and social changes desired *by the people* ... all ideas having even the slightest redeeming *social value* ... have protection") (emphasis added);

*Stromberg v. California,* 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931) (First Amendment protects "the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic.").

■ I do not mean to suggest that an individual member of society who cannot show that a personal interest in free expression is at stake has standing to contest in court a restraint on the rights of other persons. The point is, instead, that when a court considers whether a time, place, and manner restriction is "reasonable" and permissible under the First Amendment, it must weigh not simply the interests of the individual who brings the challenge against those of society, but as well the public interest in full and free public debate.

The *Perry* test sets out four factors that are to be considered when a time, place, or manner restriction on speech is attacked. One of those factors, the significance of the governmental interest, implicates the societal interest only insofar as it is embodied in the governmental attempt to regulate speech.

Two of the *Perry* factors—narrow-tailoring (or "reasonable fit" where the commercial speech doctrine is implicated) and the availability of alternative channels of communication—implicate both the individual liberty interest and the public interest in full and free debate. The narrow-tailoring requirement is designed to minimize the burdens of governmental restrictions on speech. The requirement thus serves to enlarge the amount of speech to be permitted. In this way the interests of those individuals seeking to speak are served, as is the interest of society in having the greatest range and variety of public discussion. Similarly, the requirement

that ample alternative channels of communication be available serves to promote both the individual interest in self-expression and the public interest in protecting a full public debate.

The requirement of content-neutrality serves the public interest in free speech.

*Cf. New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (First Amendment "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection ... we have staked upon [that presupposition] our all") (internal citation and quotation omitted).

It does not serve—or at least, not in the same tailored way—the individual liberty interest of the speaker, for the individual's interest in self-expression is as surely harmed by a content-neutral regulation of the individual's speech as by a content-discriminatory restriction. It is possible to conceptualize the requirement of content-neutrality in terms of an individual right, for example, as a "right to be heard on terms equal to all other speakers," but this serves to highlight the point that the primary focus of the content-neutrality requirement is the effect on the public debate as a whole and upon the public audience as a whole. The concern is not so much with the interests of the individual to speak, but with that of society to hear from a full range of viewpoints over a full range of topics.

### 3. Content–Discriminatory Purposes and Content–Discriminatory Impact

■ Content-neutrality and narrow-tailoring requirements both advance the goal that "debate on public issues should be uninhibited, robust, and wide-open," *id.* 376 U.S. at 270, 84 S.Ct. at 721. Each, however, advances a different aspect of that goal, and in a different way. Applying the narrow-tailoring requirement involves a quantitative inquiry, seeking to limit the amount of speech that will be burdened by any given regulation. Applying the content-neutrality requirement involves a qualitative inquiry, asking whether the regulation will skew or

otherwise alter the substance of public debate.

Some confusion about the nature of the content-neutrality requirement may arise, however, out of the different phrases that have been used to describe the requirement. For example, the Supreme Court, citing *Perry* among other cases for authority, has described the test as requiring that the challenged regulation be "justified without reference to the content of the regulated speech."

> *Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984);
>
> *See also Heffron v. Int'l Soc. for Krishna Consc.*, 452 U.S. 640, 648, 101 S.Ct. 2559, 2564, 69 L.Ed.2d 298 (1981) (using same phrase as *Clark;* also cited in *Clark* )
>
> *Va. Pharmacy Bd. v. Va. Consumer Council*, 425 U.S. 748, 771, 96 S.Ct. 1817, 1830, 48 L.Ed.2d 346 (1976) (same phrase as *Clark;* cited in *Clark* )
>
> *Consolidated Edison Co. v. Public Serv. Comm'n*, 447 U.S. 530, 536, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980) (regulation invalid when "based on the content [or subject-matter] of speech"; also cited in *Clark* )
>
> *Police Department of Chicago v. Mosley*, 408 U.S. 92, 96, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) ("[s]elective exclusions from a public form may not be based on content alone, and may not be justified by reference to content alone.")

The phrasing in *Clark* may tend to suggest that the content-neutrality inquiry is solely concerned with the government's interest in the regulation, and not with the impact that the regulation has on public debate. An examination of Supreme Court precedents, however, makes clear that the content-neutrality test involves a more complex inquiry into the relationship between the government's interest, the regulatory instrument chosen to advance that interest, and the necessary or likely effect that instrument will have on public debate.

> *See, e.g., Cincinnati, —— U.S. at ——, ——, 113 S.Ct. at 1511, 1516 (ordinance was content-discriminatory, despite the lack of any "mens rea" on the part of the city; the "commercial/noncommercial" distinction drawn in the statute would necessarily, in it practical application, require those administering the statute to distinguish between publications on the basis of their content.)*
>
> *Forsyth County v. Nationalist Movement, —— U.S. ——, —— – ——, 112 S.Ct. 2395, 2403–5, 120 L.Ed.2d 101 (ordinance setting fees for parade permits based on the costs of police protection for each parade was content-discriminatory because the costs of policing parades with controversial messages would be more than uncontroversial parades); compare id. at —— – ——, 112 S.Ct. at 2407–8, (Rehnquist, C.J., dissenting) (disagreeing that record below supported conclusion that ordinance would be construed and administered in a manner requiring higher fees where costs are greater due to number of people opposing speech, and not reaching the question whether the ordinance, if so construed and administered, would be content-discriminatory).*

In practice, then, the content-neutrality requirement has a lot in common with the narrow-tailoring requirement. Both involve a complex comparison and weighing of governmental "justifications" and the means chosen by the government to effect the chosen end.

The inquiry into the relationship between the proffered justification, the regulatory instrument chosen, and the effect of that regulatory instrument on the public debate is not designed merely to determine whether there is circumstantial evidence of an impermissible censorious "motive" on the part of the government. It is not a simple matter to determine what was the government agency's justification for a time, place, and manner restriction. The government, or any agency of government, is an entity, and can only be said to have a "state of mind" in the sense of a legal fiction. Sometimes the legislation itself will explicitly declare a purpose. Such a declaration is an objective manifestation of "legislative intent," just as a contract is an objective manifestation of an agreement between parties. Even though the parties may have had other subjective intentions (ev-

idence of which is not even admissible in a dispute over the meaning of the contract), so too, individual legislators may have had varied motives, but they are not the subject of judicial inquiry.

It is true that on occasion a decision of the Supreme Court may be subject to the interpretation that it turned on the factual question of the actual motivations of public officials.

> *See, e.g., Board of Education v. Pico,* 457 U.S. 853, 102 S.Ct. 2799, 73 L.Ed.2d 435 (1981) (no majority opinion; judgment reversing and remanding case); *id.* at 872–75, 102 S.Ct. at 2810–2812 (plurality opinion of Brennan, J., writing for himself and Marshall and Stevens, JJ.) (on remand district court should determine motivation of school officials for removing certain library books); *id.* at 879–82, 102 S.Ct. at 2814–2816 (Blackmun, J., concurring) (on remand trial court should determine whether school officials acted with purpose of restricting access to ideas of which they disapproved).

On the other hand, the Supreme Court has "consistently held that 'illicit legislative intent is not the sine qua non of a violation of the First Amendment.' " *Simon & Schuster, Inc. v. New York State Crime Victims Board,* —— U.S. ——, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991) (internal citations omitted).

In *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue,* 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983) the Supreme Court characterized its earlier decision in *Grosjean v. American Press Co.,* 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936) as having been based upon such a determination of impermissible purpose. 460 U.S. at 579–81, 103 S.Ct. at 1368–70. *Grosjean* involved a tax placed on certain newspapers while Huey Long was Governor of Louisiana. The briefs had brought to the attention of the court a variety of political statements made, outside the legislature, suggesting a punitive purpose. The Court concluded that "in the light of its history and of its present setting, it is seen to be a deliberate and calculated device in the guise of a tax to limit the circulation of information." *Id.* 460 U.S. at 580, 103 S.Ct. at 1369 (citing *Grosjean,* 297 U.S. at 250, 56 S.Ct. at 449).

The Court in *Minneapolis Star & Tribune* made clear, however, that a factual finding of nefarious political motivations is not necessary in order to find that a measure is invalid under the First Amendment. In that case, the legislature had passed a "use tax" on the use of ink and paper by publications. The special tax exempted the first $100,000 of such use from the tax. 460 U.S. at 577–579, 103 S.Ct. at 1365–1368. Although noting that there was no indication in the record, as in *Grosjean,* of a censorious purpose on the part of the Government, *id.* 460 U.S. at 580, 103 S.Ct. at 1369, the Court nevertheless held that the tax violated the First Amendment.

The court held, first, that since "the press was singled out for special treatment," *id.* at 582, 103 S.Ct. at 1370, and "because that differential treatment, unless justified by some special characteristic of the press, suggests that the goal of the regulation is not unrelated to suppression of expression, such a goal is presumptively unconstitutional." *Id.* at 585, 103 S.Ct. at 1372 (internal citation omitted). The presumption was not overcome, in that case, by the state's interest in raising revenue. *Id.* at 586, 103 S.Ct. at 1372.

Second, the Court noted that by exempting the first $100,000 of use from the tax, the tax in effect targeted a small number of newspapers. The court held, as an alternative ground of decision, that "whatever the motive of the legislature," this effect of the tax rendered the statute presumptively unconstitutional, and that the presumption was not overcome by the proffered justification. *Id.* at 591–93, 103 S.Ct. at 1375.

 Similar concerns about content-neutrality, not in the sense of conscious censorship, but in the sense of "censorial effects," are raised here by the Publication Distribution and Street Furniture Guidelines. The first guideline targeted publications solely. And even though the second guideline does not on its face refer to publication distribution boxes, the effect is precisely the same. The only apparent effect of the Street Furni-

ture Guideline will be to require the removal of plaintiffs' publication boxes. Governmentally-placed street furniture is exempted, and merchandise-store fronts are subjected to no more stringent review than they ever were. By defendant's admission, no other street furniture will be affected.

Dray Aff. (submitted by defendant to expand the record) ("I surveyed the fixtures placed in the public ways in the District.... Aside from newsracks the only fixtures in the public ways in the District are those installed by government agencies. Newsracks are the only privately-owned fixtures on the public ways in the District.)

In *Minneapolis Star*, the court explained one reason for viewing as presumptively invalid a tax targeted on the press. When a tax of general applicability imposes the same burden on all businesses or on the general public, there is less reason to fear that the government will "destroy a selected group of taxpayers by burdensome taxation." *Id.* at 585, 103 S.Ct. at 1371. Where, however, the government singles out the press, "the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened." *Id.* The Court also noted that

> the very selection of the press for special treatment threatens the press not only with the current *differential* treatment, but also with the possibility of *more burdensome treatment*. Thus, even without actually imposing an extra burden on the pess, the government might be able to achieve censorial effects, for the threat of sanctions may deter the exercise of First Amendment rights almost as potently as the actual application of sanctions.

*Id.* at 588, 103 S.Ct. at 1373 (emphasis in the original). It is important to understand that the "censorial effect" described here is not necessarily the effect of a threat (explicit or implicit) consciously issued by the government that enacts the challenged regulation. Rather, it is the harmful effect that the existence of the regulation is likely to have upon public debate because the press is aware that present and future governments *retain the power* to single them out for punishment.

Here, similarly, the press is affected by the ban, but local merchants, that is to say members of a constituency that the Commission serves, are exempted from the ban. Thus the same potential censorial effects exist. To say that such effects exist in no way impugns the motives of the members of the Commission.

I hold that the Street Furniture Guideline is not content-neutral.

### E. Summary

If a regulation has a tendency to burden expressions of one point of view or about one particular subject more than expressions of another point of view or about another particular subject, a First Amendment interest is implicated. Similarly, a First Amendment interest is implicated if the government retains the power to target regulations at the press.

A regulator's declaration of benign purpose cannot justify a needless burden on rights of expression caused by the regulator's use of a blunt instrument when finer instruments are available.

### VI. Orders

Orders will be entered accordingly after a conference with counsel regarding resolution (or waiver) of the claims for attorney fees and damages, and determination of the form of the final judgment to be entered.