GLOBE NEWSPAPER COMPANY & others[1] *vs.* BEACON HILL
ARCHITECTURAL COMMISSION.

Suffolk. September 12, 1995. - January 4, 1996.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Historic District Commission*, Newsrack. *Beacon Hill Architectural Commission. Boston. Statute*, Construction. *Administrative Law*, Agency, Regulations, Rulemaking, Adjudicatory proceeding, Judicial review. *Words*, "Structure," "Exterior architectural feature."

The Beacon Hill Architectural Commission had authority under St. 1955, c. 616, to adopt an architectural guideline prohibiting the placement of "street furniture," including newsracks, where such objects were "structures" within the meaning of the applicable State building code, G. L. c. 143, § 1, and where newsracks were signs or "fixtures appurtenant" regulable as "exterior architectural features" under the statute. [573-576] LYNCH, J., dissenting, with whom O'CONNOR, J., joined.

Nothing in the Beacon Hill Architectural Commission's enabling legislation or subsequent amendments thereto limited the commission's jurisdiction only to building facades [576-577]; nor was the language in other statutes creating other historic district commissions applicable by analogy to create any such limitation [577-578, 579-581]; further, language in cases that defined the term "structure" was not apposite to the definition of that term as it was used in the enabling legislation and amendments thereto pertaining to the Historic Beacon Hill District [578-579]. LYNCH, J., dissenting, with whom O'CONNOR, J., joined.

That the public works commissioner of the city of Boston has jurisdiction over the sidewalks and streets of the city does not exclude the exercise of concurrent jurisdiction over those areas by the Beacon Hill Architectural Commission for purposes set forth in its enabling legislation. [582-583]

Statutes 1955, c. 616, as amended by St. 1965, c. 429, authorizes the Beacon Hill Architectural Commission not only to make procedural rules governing the conduct of its adjudicative proceedings, but also to make

---

[1]News Boston Group, Inc.; New York Times Company; Dow Jones & Co., Inc.; Gannett Satellite Information Network, Inc.; and TAB Communications, Inc.

substantive rules regulating the conduct of the public within the historic district, with the result that the commission's promulgation of a "Street Furniture Guideline" was within its authority. [583-589] LYNCH, J., dissenting, with whom O'CONNOR, J., joined.

The Beacon Hill Architectural Commission may proscribe inappropriate architectural features within the historic district even if the practical consequence is an outright ban of certain types of structures. [589-590] LYNCH, J., dissenting, with whom O'CONNOR, J., joined.

CERTIFICATION of a question of law to the Supreme Judicial Court by the United States Court of Appeals for the First Circuit.

*John R. Devereaux*, Assistant Corporation Counsel, for the defendant.

*James C. Heigham* for the plaintiffs.

LIACOS, C.J. In 1991, the Beacon Hill Architectural Commission (commission) issued an amendment to its architectural guidelines prohibiting the placement of newsracks within the Historic Beacon Hill District (district) within Boston. The commission sent letters to various newspaper publishers, requesting that they remove their newsracks from the district. The plaintiff newspapers (newspapers) commenced litigation in the United States District Court for the District of Massachusetts. The newspapers contended that the commission's guidelines regarding newsracks violated the First Amendment to the United States Constitution, and, in the alternative, that the commission did not have the authority to issue the guidelines. The commission suspended its request to remove the newsracks until resolution of the litigation.

In 1993, with the litigation still pending, the commission promulgated another amendment to guideline 12, the "Street Furniture Guideline" (guideline), banning all "street furniture," and superseding the 1991 guidelines banning only newsracks. The new guideline provides:

> "Street furniture, as defined below, shall not be permitted in the Historic Beacon Hill District with the exception of approved store-front merchandise stands

and those structures erected or placed by authorized public agencies for public safety and/or public welfare purposes. Street furniture is defined as any structure erected or placed in the public or private ways on a temporary or permanent basis. Authorized public safety/public welfare street furniture includes, but is not limited to, such structures as street lights, traffic lights, mail boxes, fire hydrants, street trees, and trash receptacles. Any such authorized public safety/public welfare street furniture or approved storefront merchandise stands shall be subject to Commission review and shall be in keeping with the architectural and historic character of the District and the criteria for exterior architectural features as specified in [St. 1955, c. 616, as amended]."

The parties agreed to allow the Federal District Court to consider the amended Street Furniture Guideline within the pending lawsuit. The court ruled that the Street Furniture Guideline violated the First Amendment and that, in any event, the commission did not have authority to issue it. *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n,* 847 F. Supp. 178 (D. Mass. 1994).

The commission appealed, and the United States Court of Appeals for the First Circuit (Federal court) certified to us the following question: "Did the Beacon Hill Architectural Commission have authority under 1955 Mass. Acts c. 616 (as amended) to adopt the 'Street Furniture Guideline'?" *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n,* 40 F.3d 18, 25 (1st Cir. 1994). We answer the certified question in the affirmative.

The opinion of the Federal court acknowledges three components within the question referred to us: (1) whether the commission has authority to regulate what is termed street furniture; (2) whether the commission may exercise any such authority by substantive rulemaking; and (3) whether a

ban on an entire class of street furniture is inconsistent with the commission's enabling act.[2]

The Act creating the commission states as its purpose: "The purpose of this act is to promote the educational, cultural, economic and general welfare of the public through the preservation of the historic Beacon Hill district, and to maintain said district as a landmark in the history of architecture and as a tangible reminder of old Boston as it existed in the early days of the commonwealth." St. 1955, c. 616, § 2. The Justices first outlined the 1955 scheme in the *Opinion of the Justices*, 333 Mass. 783, 784-787 (1955) (*Beacon Hill Opinion*). In the *Beacon Hill Opinion*, the Justices referred to the purpose of St. 1955, c. 616, creating the Beacon Hill Architectural District in these terms: "The announced purpose of the act is to preserve this historic section for the educational, cultural, and economic advantage of the public. If the General Court believes that this object would be attained by the restrictions which the act would place upon the introduction into the district of inappropriate forms of construction that would destroy its unique value and associations, a court can hardly take the view that such legislative determination is so arbitrary or unreasonable that it cannot be comprehended within the public welfare." *Id.* at 787.

## I.

The commission's enabling statute provides that the commission shall review any construction, reconstruction, alteration, change in the exterior color, or demolition of any "exterior architectural feature"[3] of any "structure" within the district. The enabling act imports its definition of "structure"

---

[2] The opinion of the Federal court reviews the current provisions, along with a more detailed history of the controversy over newsracks on the streets of the district. The commission's scheme, amended several times since 1955, is not codified. We consider the statutory scheme as it existed in 1955 and as it exists today.

[3] Section 3 of St. 1955, c. 616, defines "[e]xterior architectural feature" as follows: "[T]he architectural style and general arrangement of such portion of the exterior of a structure as is designed to be open to view from a public way, including kind, color and texture of the building material of

from the Boston building code, but the parties have agreed that the current State building code, G. L. c. 143 (1994 ed.), having superseded the Boston building code, should govern this case. A structure is therefore "a combination of materials assembled at a fixed location to give support or shelter, such as a building, framework, retaining wall, tent, reviewing stand, platform, bin, fence, sign, flagpole, recreational tramway, mast for radio antenna or the like. The word 'structure' shall be construed, where the context allows, as though followed by the words 'or part or parts thereof'." G. L. c. 143, § 1. The newspapers contend that the commission does not have the authority to regulate newsracks because their newsracks, located on the sidewalks in the district, do not fall within these definitions. We do not agree.

The newspapers would read the statutory definition to limit the commission's jurisdiction to the buildings on Beacon Hill, precluding control over objects on the sidewalk. However, the mere fact that a newsrack rests on the sidewalk does not exclude it from the definition of structure.[4] The term "structure" includes "building" but is not limited thereto. G. L. c. 143, § 1. The newspapers have stipulated to the fact that their newsracks are affixed on sidewalks in the district. There is no requirement that a structure be permanent, for the definition of building includes portable shelters, including, inter alia, signs, reviewing stands, and tents. *Id.* A

---

such portion and type of all windows, doors, lights, signs, and other fixtures appurtenant to such portion."

[4] The parties have stipulated that the newsracks in issue are described as follows: "For more than ten years, coin-operated newspaper vending machines, commonly known as newsracks or vendor boxes and hereafter referred to as 'newsracks', have distributed daily and weekly newspapers. . . . Such newsracks are approximately four feet high and two feet wide. The newspapers are contained in a box in the upper part of the newsrack and are visible through the clear plastic front of the box. . . . Newsracks commonly are affixed along the sidewalk and can remain in the same locations on a nearly permanent basis. On the other hand, newsracks are also readily moved or removed in response to reader demand or temporary use requirements such as sidewalk construction. . . . Plaintiffs' newsracks are painted in various colors and display the name of the publication on the box. In addition, some have advertising and/or logos on multiple surfaces."

newsrack is functionally a combination of a bin and a sign, both of which are structures as defined by the State building code, G. L. c. 143, § 1.

The difficulty of proper definition of a structure stems not so much from whether a newsrack is a structure, but whether it has exterior architectural features. The newspapers attempt to draw from the definition of "exterior architectural feature" an implication that only buildings have such. They point to examples given within the definition of exterior architectural features. While it is true that buildings are in contemplation when the statute speaks of windows and doors, St. 1955, c. 616, § 3, lights and signs are not limited to buildings. In view of the general language of the definition, "general arrangement of such portion of the exterior of a structure," id., we cannot say that only buildings have exterior architectural features. Rather, any structure may have a portion open to view from a public way, and the commission has jurisdiction over the general arrangement and characteristics of the building materials thereof.[5] "Structures" that "support" may include bins, platforms, and reviewing stands.

The definition of "exterior architectural feature" provides also a list of "portions" of structures, including signs and "fixtures appurtenant." St. 1955, c. 616, § 3. The painted sides of a newsrack, advertising its wares, make it a sign. That sign is in turn affixed to a structure along the sidewalk, making it an exterior architectural feature. "Fixtures appurtenant" is a more opaque term, its components meaning "personal property [affixed] to the realty" and "[being] by right used with the land." Black's Law Dictionary 103, 638 (6th ed. 1990). By claiming that they may sell papers from newsracks without commission interference, the newspapers impliedly assert that they have a legal right to hawk

---

[5] We note also that the State board of building regulations and standards, which has authority only over buildings and structures, G. L. c. 143, § 94 (a) (1994 ed.), has regulated sidewalks. See, e.g., 780 Code Mass. Regs. § 1503.3.2 (1992) (establishing required grade of concrete for sidewalks). A sidewalk is a fixed combination of materials providing support to passersby.

their publications, as an incident to their right to use public ways. They choose to exercise that right through the use of personalty affixed on sidewalks. A newsrack is a fixture appurtenant, and the commission may regulate a newsrack whose exterior is open to public view.[6]

The newspapers raise several contrary arguments which we now take up in turn. As the Federal court noted, the guidelines in places suggest a jurisdiction limited to buildings. Those guidelines, it is stated, must to some extent reflect the commission's expert interpretation of its own enabling act. *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 40 F.3d 18, 21-22 (1st Cir. 1994). The guidelines repeatedly tell readers that the commission reviews proposed changes to the exteriors of "buildings." In at least one place, however, the guidelines offer something to the contrary. Since their inception there has been a guideline that prohibits freestanding signs. Most of the commission's work may relate to buildings, but the very document that the newspapers characterize as long-standing agency interpretation itself includes structures that are not buildings.

We now turn to the related argument that a 1963 amendment to the commission's enabling act, governing signs, demonstrates that the commission believed that its jurisdiction did not extend outward from building facades. That amendment added § 7A, which provides:

> "Signs. — No permit to erect a sign, marquee, awning, or other exterior architectural feature protruding from any structure in the Historic Beacon Hill District shall be issued by the public improvement commission of the city of Boston, or by any other agency now or hereafter authorized to issue such permits, unless the application for such permit shall be accompanied by a certificate of

---

[6]The newspapers particularly argue against the notion that a newsrack is a structure. The general thrust of their contentions do not, however, depend on the specific characteristics of newsracks. The important notion for the newspapers is that "structure" should be read as close akin to "building."

appropriateness issued under section seven." St. 1963, c. 623, § 3.

It cannot be the case, as the newspapers contend, that the purpose of this amendment was for the first time to give the commission authority over visible items protruding from buildings. The statutory definition of exterior architectural features, unchanged since 1955, provides a nonexclusive list of such features, and that list includes "signs." There was no need to extend the commission's substantive jurisdiction. We perceive a different purpose in the 1963 sign amendment. The original 1955 special act meshed the historic preservation scheme with the building permit process, making the certificate of appropriateness a prerequisite to a building permit. St. 1955, c. 616, § 5. Under that scheme, any other permit that affected exterior architectural features could be had without first obtaining a certificate from the commission. This meant that a sign might be erected before the commission could review the proposal. The 1963 amendment rectified this, meshing the historic preservation scheme with the sign permitting process. This intent appears most clearly in the catch-all language that meshes the commission's review with any other city permitting scheme. St. 1963, c. 623, § 3.

The newspapers point to language in other statutes to bolster their claims that the terms "structure" and "exterior architectural feature" should be narrowly interpreted. When the Justices delivered the *Beacon Hill Opinion, supra,* the Justices also considered a similar statute creating the Nantucket Historic Commission. The opinions regarding the two statutes were essentially the same. Compare *Opinion of the Justices,* 333 Mass. 773, 776-782 (1955) (*Nantucket Opinion*) with *Beacon Hill Opinion, supra* at 787-791. The newspapers take note of portions of the *Nantucket Opinion* in an attempt to demonstrate that the commission here has jurisdiction only over the exterior of buildings.

Specifically, the newspapers point to the description of the Nantucket preservation scheme, which as the Justices stated "does not apply to details of design or sizes of buildings or

interior arrangement of building features not subject to public view." *Nantucket Opinion, supra* at 781. Because there was no significant difference in the two statutes, the quoted language is offered to demonstrate that the jurisdiction of both historic district commissions does not extend beyond the buildings themselves. Yet the meaning of the term "exterior architectural feature" was not posed to the Justices in 1955. The Beacon Hill statute, unlike its Nantucket companion, defined the terms "structure" and "exterior architectural feature," providing the Justices with guidance as to meaning. In this matter, those definitions lead the court to reject the newspapers' "buildings-only" reading of the statute. More importantly, the quoted portion of the *Nantucket Opinion, supra*, does not describe the scope of the Nantucket commission's jurisdiction, rather it describes a statutory limitation on that jurisdiction. The Nantucket Act provides: "The Historic Districts Commission shall not consider detailed designs, relative size of buildings in plan, interior arrangement or building features not subject to public view." St. 1955, c. 601, § 8 (c). The quoted provision made it clear that the Nantucket historic districts commission was to review only features visible to the public in its historic preservation effort. In other words, the provision merely limits an historic district commission's jurisdiction over structures (and portions thereof) not in public view. Thus, we conclude that the terms "structure" and "exterior architectural feature" are not to be narrowly construed in the way the newspapers contend.

In a similar vein, the newspapers see guidance in some of our other cases defining the term "structure," citing *Williams* v. *Inspector of Bldgs. of Belmont*, 341 Mass. 188 (1960), and *Millbury* v. *Galligon*, 371 Mass. 737 (1977). The newspapers draw from these cases that the term "structure" should be read akin to "building," and therefore should not encompass a newsrack. See *Inspector of Bldgs. of Falmouth* v. *General Outdoor Advertising Co.*, 264 Mass. 85, 87-89 (1928) (holding that billboard was not structure within meaning of the zoning enabling act, G. L. c. 40, § 25). These decisions are inapposite, for they interpreted the

term "structure" as defined in local by-laws. In *Galligon* we found that a billboard was not a "structure" pursuant to language which expressly defined both "structure" and "sign." The zoning by-law at issue in *Williams* provided no definition of "structure," and we held that a tennis court was a use of land, not a structure. *Id.* at 191. This interpretation focused on the specific zoning provisions regulating buildings and structures, as opposed to uses. We were unwilling to extend the term "structure" to a use of land. *Williams, supra* at 190-191. These opinions demonstrate that we have been sensitive to the purposes for which the term "structure" has been used in the particular statute or regulation in issue. To the extent that our cases interpreting the term "structure" in other statutes and by-laws are relevant, as the newspapers contend, there are numerous other cases that take a broad interpretation and reach the opposite conclusion from *Galligon* and *Williams*. See, e.g., *Scott v. Board of Appeal of Wellesley*, 356 Mass. 159, 161-162 & n.2 (1969) (holding that swimming pool was structure for zoning by-law purposes although it was mostly below ground level); *Selectmen of Lancaster v. DeFelice*, 352 Mass. 205, 208 (1967) (finding that combination of platform that extended at ground level out over a steep slope, a retaining wall, and door to a storage space under the platform was a "structure" under a zoning by-law); *Nash v. Commonwealth*, 174 Mass. 335, 336 (1899) (holding that an aqueduct, entirely underground in places, was a structure for purposes of the mechanic's lien statute). Cf. *Wilbur v. Newton*, 307 Mass. 191, 193-194 (1940) (interpreting "building" in court decree to include a "structure" whose roof had been removed when such was required to fulfil the purpose of the injunction).

The newspapers also seek to rely on language from the enabling act of the commission's counterpart, the Back Bay Architectural Commission. The General Court created this historic district in 1966. The Back Bay Architectural Commission's organic statute appears to be modeled on the Beacon Hill statute of eleven years earlier. St. 1966, c. 625. The newspapers find significance in the differences between the

definitions of "structure" and "exterior architectural feature" in the Back Bay and Beacon Hill statutes. Compare St. 1966, c. 625, § 3, with St. 1955, c. 616, § 3. It is often true that language in subsequent statutes addressing the same subject may be instructive. See generally 2B Singer, Sutherland Statutory Construction §§ 49.09-49.11 (5th ed. 1992). At the same time, reliance on subsequent legislation in this manner requires care so as not to read significance into the Legislature's changing of words if the Legislature sought merely to improve the prior language rather than materially change the substance of the earlier act. See *Globe Newspaper Co.* v. *Boston Retirement Bd.*, 388 Mass. 427, 432-433 (1983) (material changes can provide evidence of new meaning in second of similar statutes). See also 2B Singer, *supra* at § 49.10.

In defining "structure," the Beacon Hill statute simply incorporated by reference the definition within the Boston building code, to which the Back Bay statute added the phrase "together with related paving, fencing or masonry or stone walls." The newspapers argue that, by adding that phrase, the General Court may have indicated that the language of the 1955 Beacon Hill statute did not include certain things within its definition of "structure," that were explicitly added in the later statute. These items include paving, which allegedly includes sidewalks. We note, however, that the same General Court that created the Back Bay Architectural District created an historic district in the town of Petersham, with a statute similar in substance and language to the Beacon Hill and Back Bay special acts. St. 1966, c. 211. The Petersham definition of structure reads: " 'Structure', a combination of materials other than a building, including a sign, fence or masonry wall but not including a walk or driveway." *Id.* at § 3. If we employ the same reading of statutory language as the newspapers do when they read the Back Bay Act, we would conclude that "structure" includes walks and driveways. The same General Court could not have looked at the ordinary meaning of "combination of materials" and concluded that "structure" both included and excluded side-

walks. The General Court's choice of words in these two 1966 statutes cannot support inferences about the meaning of the 1955 Beacon Hill special act.

That the Legislature's usage in the Back Bay statute was clarification and not a clear indicator of things excluded from the earlier Beacon Hill definition of structure is elsewhere apparent. The added phrase in the Back Bay legislation included "fencing or masonry or stone walls" within the definition of structure. St. 1966, c. 625, § 3. Yet the definition of structure starts by incorporating the Boston building code, and that code already included "fences" and "retaining walls" within the concept of "structure." Boston Building Code § 106 (a) (1964). The express mention of fencing within the 1966 Back Bay statute cannot mean that the original Beacon Hill statute did not include fencing as structures. The Back Bay language is merely adaptation to the peculiar needs of that district.

Thus, we conclude that, where we interpret path-breaking legislation in the historic-preservation field, we should not be quick to infer large differences from subsequent legislative fine tuning and refinement of statutory language. We are unwilling to draw so broad a conclusion as the newspapers do from small differences in the Back Bay statute.[7]

---

[7]We are of the same view with respect to the differences in the Beacon Hill and Back Bay statutes' different definitions of "[e]xterior architectural feature." The Back Bay special act adds to the earlier definition "the location and adequacy of vehicular access, if any, and the location and treatment of any parking space for motor vehicles open to view from such public street or way." St. 1966, c. 625, § 3. The newspapers contend that this expressly governs sidewalks (and therefore imply that the Beacon Hill statute did not) because vehicular access to parking spaces must, of necessity, cross sidewalks.

We view this as refinement of language rather than indicating a major distinction in legislative intent. We are bolstered in this conclusion by the fact that the problem addressed by the vehicular access language — off-street driveways and parking spaces visible from the street — is simply not present among the row houses that populate Beacon Hill. The added phrase clarifies that an exterior architectural feature not common on Beacon Hill is within the Back Bay Commission's jurisdiction. Cf. *Parker* v. *Beacon Hill Architectural Comm'n,* 27 Mass. App. Ct. 211, 214-215

The newspapers argue to us an issue not presented to the United States District Court or the Federal court. We address this argument briefly nonetheless so as to preclude any further delays in this litigation. Cf. *Fischer* v. *Bar Harbor Banking & Trust Co.*, 857 F.2d 4, 8 (1st Cir. 1988) (Federal court accepting State court's treatment of issue in answering certified question that would have been waived had Federal court decided issue). The newspapers offer several special acts of the Legislature that form part of the charter of the city of Boston in an attempt to demonstrate that the public works commissioner has exclusive jurisdiction over the public ways. This, the newspapers argue, precludes the commission's jurisdiction over the sidewalks and the street furniture thereon.[8]

That the public works commissioner of Boston may have jurisdiction over the streets and sidewalks of the city does not mean that an agency that the General Court has established by special act does not have concurrent jurisdiction. See *Marr* v. *Back Bay Architectural Comm'n*, 23 Mass. App. Ct. 679, 685-686 (1987). The implication of the newspapers' argument is that the public works commissioner has jurisdiction exclusive of all other government authorities. That is demonstrably not the case, for the city's own transportation department regulates parking, streetlights, and traffic control signs. St. 1986, c. 608, § 20.

Concurrent jurisdiction does not present any practical problems. The commission's statutory scheme meshes fully with any permitting authority that the public works department might have in place. Indeed, when installing traffic signals on the public ways of the district, the relevant city de-

---

(1989) (noting that the commission had reviewed and rejected a proposal for a garage door opening to an underground parking structure).

[8]The two statutes at issue date from 1907 and 1909, and confer jurisdiction over obstructions both temporary and permanent to the board of street commissioners. St. 1909, c. 486, § 28. St. 1907 c. 584. A subsequent ordinance reorganizing the city government transferred this authority to the public works commissioner, under the supervision of the mayor. Boston Code (Ordinances) § 11-6.3 (1985).

partment has applied to the commission for certificates of appropriateness. Notably, some installations were found inappropriate and recommendations for changes were made. For example the commission specifically required that the city return brick sidewalks to their original condition after removing inappropriate exterior architectural features thereon. Notice of Decision, Application No. 89.308, at 1 (Beacon Hill Architectural Comm'n Oct. 17, 1989).

## II.

We undertake the next phase of the inquiry. Authority over a particular thing says nothing about the permissible methods of exercising that authority. We consider whether the 1965 amendment to the enabling act authorizes the commission to make substantive rules that regulate the conduct of some segment of the general public.

An administrative agency has jurisdiction to establish regulations that bear a rational relation to the statutory purpose. See *Life Ins. Ass'n* v. *Commissioner of Ins.*, 403 Mass. 410, 417 (1988); *Levy* v. *Board of Registration & Discipline in Medicine*, 378 Mass. 519, 524-525 (1979); *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977). The newspapers claim that our usual review of agency actions, looking only for a rational relationship, is not appropriate here. They would instead have us apply a "necessary implication" standard. We use that standard to review the actions of municipalities that may lie outside their powers under the Home Rule Amendment. See *Greater Boston Real Estate Bd.* v. *Boston*, 397 Mass. 870 (1986) (ban on condominium conversions not a necessary implication of a municipality's authority under a rent control enabling act). In contrast, our usual deferential standard is appropriate here because the General Court directly established the commission by special enabling act. The commission is therefore an agency created by the State.[9] The city government has no

---

[9]It is within the environment department of the city for administrative and reporting purposes only.

particular control over the commission, other than the statutory selection of commission members by the mayor as the appointing authority. In this context, the commission argues that we recognize a need for agency flexibility in meeting its mandate from the Legislature. This principle, it is claimed, should lead us to conclude that the commission should have the flexibility to select between adjudicatory and rulemaking procedures.

In addition to looking for a rational relationship, we also look to ensure that the agency action has some express or implied basis in the governing statute. See, e.g, *Commissioner of Revenue* v. *Marr Scaffolding Co.*, 414 Mass. 489 (1993) (Appellate Tax Board had power only to grant abatements of illegal taxes and had no power at equity); *Morey* v. *Martha's Vineyard Comm'n*, 409 Mass. 813 (1991) (agency improperly promulgated a regulation not authorized by statute to provide for an additional method for development projects to come before it for review).

The commission relies on a 1965 amendment to its enabling statute as the font for substantive rulemaking authority sufficient to support the Street Furniture Guideline. That amendment added the following to § 4 of the enabling act: "The commission may adopt, amend and repeal *rules for the regulation of its affairs and the conduct of its business . . .*" (emphasis supplied). St. 1965, c. 429, § 2. The newspapers contend that this language only allows the commission to make rules governing the conduct of the adjudicatory proceedings by which the commission reviews certificates of appropriateness and non-applicability.

We generally construe statutes to give effect "to the intent of the Legislature [as] ascertained from all [the statute's] words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *Commonwealth* v. *Galvin*, 388 Mass. 326, 328 (1983), quoting *Board of Educ.* v. *Assessor of Worcester*, 368 Mass. 511, 513 (1975). The ena-

bling act provided for adjudicatory proceedings, and the commission argues that before the 1965 amendment it, of necessity, would have had the power to establish rules governing those proceedings. The commission concludes from this that the 1965 amendment must have added something to the statute, i.e., substantive rulemaking authority.

This is an attempt again to use subsequent legislation to discern the meaning of earlier statutory language. We are on somewhat firmer ground here, because we confront a subsequent change of the very same statute. 2B Singer, *supra* at § 49.09. The original version of the enabling act did contain some express procedural rulemaking authority. Sections 6 and 7 set most of the procedures and standards by which the commission reviews proposed changes on Beacon Hill, but those sections also gave the commission power to determine what evidence an applicant must present, and how many commissioners will decide questions of non-applicability of the statute. St. 1955, c. 616, §§ 6-7, as amended by St. 1958, c. 314, § 2.[10] If the General Court enacted the 1965 amendment merely to clarify the commission's procedural rulemaking authority, §§ 6 and 7 seem to be the locus of such power in the scheme. Instead the 1965 amendment changes § 4, which establishes the commission as well as setting out its membership and general structure. We take this as some indication that the 1965 amendment was not concerned with the commission's control over its internal procedures for reviewing applications for certificates.

Statutory language elsewhere in the General Laws is proffered to support the commission's claim of substantive rulemaking authority. In 1971 the General Court revised the

---

[10]Section 7 provides in part: "Certificate of Appropriateness. — No person shall construct any exterior architectural feature in the historic Beacon Hill district, or reconstruct, alter, change the exterior color of or demolish any such feature now or hereafter in said district, until such person shall have filed with the secretary of the commission an application for a certificate of appropriateness in such form and with such plans, specifications and other material as the commission may from time to time prescribe and a certificate of appropriateness shall have been issued as hereinafter provided in this section."

historic districts enabling act that provides a framework for
cities and towns in the Commonwealth to establish historic
district commissions. St. 1971, c. 359, amending G. L.
c. 40C. That statute closely parallels, in both structure and
language, the Beacon Hill Architectural Commission's ena-
bling act. The 1971 enabling act has a provision almost mir-
roring that of the 1965 amendment to the Beacon Hill
scheme:

> "The [historic district commission] . . . may adopt
> and amend such rules and regulations not inconsistent
> with the provisions of this act and prescribe such forms
> as it shall deem desirable and necessary for the regula-
> tion of its affairs and the conduct of its business." G. L.
> c. 40C, § 10 (e).

In our view, G. L. c. 40C's difference from the Beacon Hill
statute's wording did not change the substance of the earlier
language. The 1971 language clarifies that historic district
commissions could prescribe forms as well as "rules and reg-
ulations." The more important difference that the parties dis-
cuss is the 1971 statute's inclusion of the phrase "not incon-
sistent with the provisions of this act." Any judicial review of
agency action embodies the principle that an agency has no
inherent authority beyond its enabling act and therefore it
may do nothing that contradicts such legislation. See *Marr
Scaffolding Co.*, *supra* at 493; *Opinion of the Justices*, 138
Mass. 601, 602-603 (1885) (General Court may delegate to
an agency the power to make rules "not inconsistent with
existing laws"). That phrase in the 1971 statute is simply the
Legislature's codification of a judicial standard. See
2B Singer, *supra* at § 49.10.

We note that similar language appears in the enabling
acts of many other agencies.[11] The language giving an

---

[11]See, e.g., Massachusetts Educational Financing Authority, G. L. c.
15C, § 5 *(a)* *(1994 ed.)*; Massachusetts Housing Finance Agency, St.
1966, c. 708, § 4 *(b)*; Massachusetts Home Mortgage Finance Agency, St.
1974, c. 846, § 4 *(b)*; Massachusetts Community Development Finance

agency the power to promulgate rules and regulations for the "conduct of its business and regulation of its affairs" is typical of the delegation of general rulemaking authority. Such language is not at all restricted to procedural rules. This conclusion is confirmed by the fact that the rulemaking authority in the commission's statute is identical to that of many of the agencies in the Commonwealth, such as the Massachusetts Port Authority, Massachusetts Turnpike Authority, Economic Development and Industrial Corporations, Massachusetts Home Mortgage Finance Agency, Massachusetts Housing Finance Agency, Massachusetts Community Development Finance Corporation. A review of the regulations of such agencies demonstrates that they exercise rulemaking authority beyond mere internal procedural rules. We conclude that whatever the precise distinctions between substantive, procedural, and these quasi-substantive internal regulations, the language of the 1965 amendment provides the commission with the power to issue rules that govern private conduct within the geographic area that it regulates — the exterior architectural features within the Historic Beacon Hill District.[12]

---

Corporation, G. L. c. 40F, § 3 (*a*) (1994 ed.); Massachusetts Product Development Corporation, G. L. c. 40K, § 5 (1) (1994 ed.), local water and sewer commissions, G. L. c. 40N, § 8 (*a*) (1994 ed.); Educational Facilities Authority, St. 1968, c. 614, § 5 (*a*); Massachusetts State College Building Authority, St. 1963, c. 703, § 4 (*a*); University of Massachusetts Building Authority, St. 1960, c. 773, § 4 (*a*); University of Lowell Building Authority, St. 1961, c. 557, § 4 (*a*), as amended by St. 1975, c. 708; Southeastern Massachusetts University Building Authority, St. 1964, c. 703, § 4 (*a*), as amended by St. 1970, c. 347; Massachusetts Turnpike Authority, St. 1952, c. 354, § 5 (*a*); Massachusetts Port Authority, St. 1956, c. 465, § 3 (*a*), as amended by St. 1972, c. 198; Massachusetts Water Resources Authority, St. 1984, c. 372, § 6 (*a*); economic development and industrial corporations, G. L. c. 121C, § 5 (*b*) (1994 ed.); Massachusetts Horse Racing Authority, G. L. c. 128A, § 20 (*a*) (1994 ed.); Woods Hole, Martha's Vineyard and Nantucket Steamship Authority, St. 1960, c. 701, § 4 (*d*); Massachusetts Wholesale Electric Company, St. 1975, c. 775, § 5 (*a*).

[12] An historic district commission's "control" of a section of real property, whether it be particular historic buildings, sites, or entire sections of

We observe also that the commission has authority to conduct adjudicatory proceedings in its review of applications for certificates of appropriateness and nonapplicability. The enabling act sets out certain time limits, rights of affected parties to notice, and the right to a public hearing. St. 1955, c. 616, §§ 6, 7. The act also requires the commission to "spread upon its records" the reasons for any denial of a certificate. § 7. This requirement promotes meaningful judicial review provided for in § 10, which review seeks to curb arbitrary agency action for which the commission's reasons are "unwarranted by the evidence or . . . insufficient in law."

Where, as here, the Legislature has given the commission only the broadest of guidance (appropriateness), the agency itself will set many of the policies and standards against which a reviewing court will test the evidence. As a result, effective judicial review requires that the court and litigants be able to determine what the substantive standards and policies of the agency are. The commission, required to record the reasons for its decisions, can set policy through the results of its adjudication. Rulemaking places broad agency policy in a place where litigants and courts may access it. Those rules are at least relevant in all the adjudicatory proceedings that courts later review. Litigants may challenge agency action as insufficient at law or unwarranted by the evidence in part based on agency deviation from the policies stated in its rules. Substantive rules or agency guidelines allow courts to compare the commission's action in particular cases with stated policy, thus preventing arbitrariness. See *Parker* v. *Beacon Hill Architectural Comm'n*, 27 Mass. App. Ct. 211, 217 (1989) (comparing a particular denial against commission general guideline no. 5). This makes judicial review, although deferential, more than an empty shell.

With an eye toward the purposes behind authorizing rulemaking when the Legislature commits some policymaking to an agency, we conclude that the 1965 amendment

towns is, of course, somewhat unique in that its mandate is the preservation of the character of a particular geographic area.

grants the commission authority to issue the Street Furniture Guideline.

### III.

The final facet of the question that the Federal court referred to us returns us to the commission's substantive jurisdiction. The parties discuss whether the Street Furniture Guideline is "consistent" with the commission's enabling act. In the parties' arguments on this score there is some confusion of issues. They in large part reargue the question of substantive rulemaking authority. Nevertheless, within this issue there is one specific challenge to the Guideline completely banning newsracks and other street furniture. The newspapers contend that the enabling act allows the commission to regulate *portions* of individual structures, and that a complete ban on an entire class of structure, without consideration given to the setting of each individual structure, violates the statute.[13] The newspapers' argument derives again from their definition of "exterior architectural feature," which speaks of the "architectural style and general arrangement of such portion of the exterior of a structure as is designed to be open to view from a public way." St. 1955, c. 616, § 3. The newspapers argue that the appropriateness of exterior architectural features cannot be determined for an entire class of structures because the commission cannot know what the surroundings will be, and those surroundings affect the visibility from a public way as well as factors relevant to appropriateness.

What this argument misses is that the power to regulate portions of buildings visible from public ways, when applied to certain kinds of structures, may have the effect of allowing

---

[13]We focus here on the ability of the commission to ban an entire class of structures. The manner in which the parties have framed the issues has separated our normal two-part inquiry, ensuring rational relationship with an agency's purpose and no inconsistency with the enabling act, into the jurisdictional challenge we took up in Part I, *supra*, and the argument that we address now. We emphasize that we do not in any way consider constitutional arguments on freedom of speech, leaving those issues (not conveyed to us) to the Federal court.

the commission to ban an entire class of structures. For example, we suspect that skyscrapers would in no case be found appropriate. Such would be a ban on an entire class of structures, without regard to the specific location within the district. See *Parker, supra* at 215-216 (additional fifth story of a building found inappropriate). Therefore, the commission could, as a practical consequence of its power, ban certain types of structures within the district. The same might be true as to neon signs open to public view within the district.

There is nothing in this principle limiting it to large structures. The critical point is that the structures or signs subject to a complete ban may have, by their very nature, inappropriate portions in public view. In brief, certain classes of structures may be impossible to construct without such inappropriate portions. So it is with newsracks and other street furniture. Those structures, as generally conceived, will have a significant portion of their exterior, if not all of it, open to public view. The commission has determined that such structures are inappropriate, in part because they did not exist at the time with which the commission's preservation efforts are concerned. The particular surroundings within the district are not important in such cases.[14]

## IV.

In summary, we conclude that the commission does have the authority to promulgate the Street Furniture Guideline. As to streets and sidewalks, the commission's jurisdiction is concurrent with appropriate municipal agencies. Regulation

---

[14]The newspapers argue that the Street Furniture Guideline, as applied to Charles Street, is inconsistent with the act. This fact-specific question is not directly asked of us. The argument does not truly charge inconsistency with the act. Rather, the newspapers contend that Charles Street was "a lost cause" well before the Street Furniture Guideline went into effect. We note that as to Charles Street, this may have been true before St. 1955, c. 616, went into effect. The commission's charge is to preserve what it can of the Historic Beacon Hill District as a tangible reminder of old Boston. That particular nonconforming uses predated that charge (such as the widening of Charles Street), or that certain nonconforming uses have since been allowed to continue, has no effect on ongoing attempts the commission makes in preserving the district.

of the sidewalks is rationally related to the goal of preserving the Historic Beacon Hill District. Section 4 of the enabling act provides the commission with the authority to issue rules that govern private conduct within its particular geographic area of responsibility. We conclude that, apart from constitutional considerations, outright bans on certain classes of structures are merely a practical consequence of the commission's ability to proscribe inappropriate exterior architectural features within the district. We answer the certified question, "Yes." The Reporter of Decisions is to furnish attested copies of this opinion to the clerk of this court. The clerk in turn will transmit one copy, under the seal of this court, to the clerk of the United States Court of Appeals for the First Circuit, as answer to the question certified, and will also transmit a copy to each party.

LYNCH, J. (dissenting, with whom O'Connor, J., joins). Because I believe that the Beacon Hill Architectural Commission (commission) exceeded its authority by issuing the "Street Furniture Guideline" (guideline), I dissent from the court's opinion.

Essential to the court's decision is the determination that a newsrack is a structure with exterior architectural features. From this the court concludes that the commission has authority to regulate the exterior architectural features of newsracks. In addition, the court reasons, the commission's authority to regulate the exterior architectural features of newsracks includes the authority to issue a regulation banning street furniture, including newsracks, no matter what their exterior architectural features may be, by promulgating a substantive guideline to that effect.

I disagree with the court's reasoning, as well as its ultimate conclusion. While I agree with the United States District Court for the District of Massachusetts (District Court) and the United States Court of Appeals for the First Circuit (First Circuit) that the question whether a newsrack is a

"structure" is a close one,[1] I also believe that it is the wrong question. The commission does not have authority, either express or implied, to regulate "structures." The commission has the authority to regulate "exterior architectural features" of the Historic Beacon Hill District (district).[2] Therefore, the pertinent question is whether, by banning newsracks and other street furniture from the sidewalks of Beacon Hill, the commission is regulating the exterior architectural features of the district. I believe the answer to this question must be, "No."

To hold that a newsrack has "exterior architectural features" expands the commonsense meaning of that term to the point where it would be difficult, if not impossible, to find a physical object which did not fit within the purview of the commission. The "intent of [a] statute is to be ascertained from all its terms and parts and the subject matter to which it relates, and [the statute] should be so construed as to make it an effectual piece of legislation in harmony with common sense and sound reason." *Tilton* v. *Haverhill*, 311 Mass. 572, 577-578 (1942), quoted in *McGonigle* v. *The Governor*, 418 Mass. 147, 151 (1994). The court focuses on

---

[1]See *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n*, 40 F.3d 18, 22 (1st Cir. 1994) ("a close question"); *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n*, 847 F. Supp. 178, 183 (D. Mass. 1994) ("a close and rather curious question").

[2]The provisions of the enabling legislation, taken in their entirety, make it clear that the commission's purview is not "structures" but "exterior architectural features," as the following excerpts indicate:

"[E]very person about to apply to the building commissioner for a permit to construct any structure in the Historic Beacon Hill district or to reconstruct, alter or demolish any structure now or hereafter in said district shall deposit with the secretary of the commission his application for such permit . . . . [T]he commission . . . shall consider such application . . . and determine whether any exterior architectural feature is involved. If it is so determined that no exterior architectural feature is involved, the secretary of the commission shall . . . return the application . . . to the applicant." St. 1965, c. 429, § 3, amending St. 1955, c. 616, § 6.

"No person shall construct any exterior architectural feature in the historic Beacon Hill district, or reconstruct or alter any such feature now or hereafter in said district, until [a certificate of appropriateness is received]." St. 1955, c. 616, § 7.

the statute's reference to "structure" in defining exterior architectural features.[3] However, the definition as a whole clearly refers to a particular subset of structures: those which might reasonably be expected to have an "architectural style"; to be composed of "building material"; and to have "doors, lights, signs, and other fixtures." St. 1955, c. 616, § 3. There is no reason to assume that every "structure" included in the broad statutory definition has "exterior architectural features." Cf. G. L. c. 143, § 1 (1994 ed.). Indeed, it is more reasonable to conclude that the only structures with exterior architectural features are buildings. I conclude that the commission has no authority to regulate newsracks.

Other factors support this conclusion. As the First Circuit points out, the commission in its own literature "ratif[ies] the plaintiffs' interpretation." *Boston Globe Co. v. Beacon Hill Architectural Comm'n*, 40 F.3d 18, 21 (1st Cir. 1994). The commission's own architectural guidelines state that "the statute authorizes the Beacon Hill Architectural Commission to review proposed changes to the exterior architectural features of *buildings* within the historic district . . . . Owners contemplating changes to the exterior of any *building* within the . . . District should be aware that no alteration will be approved that is inappropriate to the historic character, architectural design, and materials of the *building* . . ." (emphasis added). While not dispositive, the commission's own interpretation of its statute is entitled to some deference. See *Greater Media, Inc. v. Department of Pub. Utils.*, 415 Mass. 409, 414 (1993).[4] Furthermore, as I have stated, it is a close

---

[3]Statute 1955, c. 616, § 3, defines "[e]xterior architectural feature" as: "[T]he architectural style and general arrangement of such portion of the exterior of a structure as is designed to be open to view from a public way, including kind, color and texture of the building material of such portion and type of all windows, doors, lights, signs, and other fixtures appurtenant to such portion."

[4]The court points out that the commission has also had a long-standing prohibition against freestanding signs. I would not defer to the commission on this point for the following reasons: First, the validity of the freestanding sign regulation is not before us. Second, the commission may not promulgate regulations that exceed its statutory authority. Thus, I agree with

question whether newsracks are structures, even under the broad definition provided in G. L. c. 143, § 1.[5]

Moreover, not only did the commission lack the authority to regulate newsracks, but it was also without authority to promulgate any guidelines of the type in question. I believe this to be so because, as the District Court reasoned, the commission does not have the power, either express or implied, to issue substantive rules. As a threshold issue, the proper standard for reviewing a commission guideline is whether "the legislative declaration *expressly* authorizes it" or whether it "is *necessary* to effectuate the legislative intent embodied in the statute relied on as the source of municipal power. A reasonable relationship between the [guideline] and the statute is not enough." (Emphasis in original.) *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n*, 847 F. Supp. 178, 186-187 (D. Mass. 1994), quoting *Greater Boston Real Estate Bd. v. Boston*, 397 Mass. 870, 877 (1986).[6]

---

the District Court that the guideline prohibiting freestanding signs is of dubious validity. See *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n, supra* at 189.

[5]General Laws c. 143, § 1 (1994 ed.), in relevant part, defines "[s]tructure" as "a combination of materials assembled at a fixed location to give support or shelter, such as a building, framework, retaining wall, tent, reviewing stand, platform, bin, fence, sign, flagpole, recreational tramway, mast for radio antenna or the like."

[6]The "necessary implication" standard applies in this case where we are investigating the authority of a municipal entity which could not act without explicit legislative authorization. See *Greater Boston Real Estate Bd.* v. *Boston*, 397 Mass. 870, 877 (1986). The court concludes that the commission is an "agency created by the State," see *ante* at 583, simply because it required an act of the Legislature to create it, and therefore that the reasonable relationship standard applies. See *Consolidated Cigar Corp.* v. *Department of Pub. Health*, 372 Mass. 844, 855 (1977). I disagree.

The text of the legislation makes clear that the commission is a body entirely contained within the city of Boston and under the control of the mayor of Boston. See, e.g., St. 1955, c. 616, § 4, as amended by St. 1965, c. 429, § 1 ("There shall be *in the building department of the city* a board, known as the Beacon Hill Architectural Commission . . . . Any commissioner . . . may be removed *by the mayor*" [emphasis added]); St. 1982, c. 624, § 1 ("There shall be in the city of Boston a department known as the

The statute does not expressly authorize the commission to issue the guideline. The court discerns such authorization in the 1965 amendment to the enabling statute, which provides that the commission may make "rules for the regulation of its affairs and the conduct of its business." St. 1965, c. 429, § 2. The court's reasoning is unpersuasive for the following reasons. The rules amendment was added to § 4 of the enabling statute, a section which sets out the makeup and procedures of the commission. St. 1955, c. 616, § 4. This section is the logical place to insert an amendment authorizing procedural rules, but not substantive ones. In addition, cases preceding the date of the amendment indicate that the "phrase was commonly used to refer at most to the internal management of an entity . . . if not strictly to matters of procedure." *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, supra* at 185. See *Insurance Co. of N. Am. v. Commissioner of Ins.,* 327 Mass. 745, 749 (1951); *Burt v. Municipal Council of Taunton,* 275 Mass. 535, 542 (1931); *Tapper v. Boston Chamber of Commerce,* 249 Mass. 235, 242-243 (1924). I conclude that the rules amendment confirms the commission's power to issue procedural rules, not substantive regulations. Accordingly, the statute provides no express authority for the commission to issue the guideline.

Neither does the statute provide the commission with implied authority for substantive rulemaking. There is no indication that such power is "necessary to effectuate the legislative intent embodied in the statute," *Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, supra* at 186, quoting *Greater Boston Real Estate Bd., supra* at 877. The commission is empowered to determine, on a case-by-case basis, "whether the proposed construction, reconstruction or altera-

---

environment department which shall provide support staff and resources to enable *the following city commissions* to carry out their responsibilities as required by law . . . *Beacon Hill architectural commission . . .*" [emphasis added]).

For a discussion of the standard of review of regulations, see *Arthur D. Little, Inc. v. Commissioner of Health & Hosps. of Cambridge,* 395 Mass. 535, 557 (1985) (Lynch J., dissenting).

tion of [a particular] exterior architectural feature . . . will be appropriate to the preservation of the . . . district." St. 1955, c. 616, § 7. The statute continues:

> "In passing upon appropriateness, the commission *shall consider*, in addition to any other pertinent factors, the historical and architectural value and significance, architectural style, general design, arrangement, texture, material and color of the exterior architectural feature involved and the relationship thereof to the exterior architectural features of other structures in the immediate neighborhood" (emphasis added). *Id.*

Inferring a legislative intent to give the commission power to ban entire classes of structures by promulgating substantive rules would eviscerate the statutory command that the commission must decide the appropriateness of each case individually. Under the contested guideline, on the other hand, the commission may "bar every newsrack without regard to the distinctive exterior architectural features of any particular newsrack." *Globe Newspaper Co.* v. *Beacon Hill Architectural Comm'n, supra* at 185. There is no indication that the Legislature intended to confer such "unfettered discretion" on the commission. *Id.* at 188. Therefore, I conclude that the commission did not have implied authority to issue the guideline.[7]

In summary, then, because the commission did not have authority to regulate newsracks nor did it have express or implied authority to issue the "Street Furniture Guideline," I

---

[7]The court suggests that allowing the commission to promulgate substantive rules will ensure effective judicial review of the commission's actions. I find this argument unpersuasive for the following reasons. First, the statute clearly provides for appeals from and judicial review of commission decisions, see St. 1955, c. 616, § 10, as amended by St. 1965, c. 430, § 7. There is no reason to believe that the review of individual applications is not an effective way to ensure compliance with the statute. Cf. *Parker* v. *Beacon Hill Architectural Comm'n*, 27 Mass. App. Ct. 211 (1989). Second, even if substantive rulemaking power did make review more effective, that is not a reason to read such power into the statute where it does not exist.

respectfully dissent. I would answer the certified question, "No."